## PATE, WARDEN v. ROBINSON.

No. 382.   Argued January 26, 1966.—Decided March 7, 1966.

*Richard A. Michael,* Assistant Attorney General of Illinois, argued the cause for petitioner. With him on the brief were *William G. Clark,* Attorney General, and *Philip J. Rock,* Assistant Attorney General.

*John C. Tucker* argued the cause for respondent. With him on the brief was *Albert E. Jenner, Jr.*

MR. JUSTICE CLARK delivered the opinion of the Court.

In 1959 respondent Robinson was convicted of the murder of his common-law wife, Flossie May Ward, and was sentenced to imprisonment for life. Being an indigent he was defended by court-appointed counsel. It was conceded at trial that Robinson shot and killed Flossie May, but his counsel claimed that he was insane at the time of the shooting and raised the issue of his incompetence to stand trial. On writ of error to the Supreme Court of Illinois it was asserted that the trial court's rejection of these contentions deprived Robinson of due process of law under the Fourteenth Amendment. His conviction was affirmed, the court finding that no hearing on mental capacity to stand trial had been requested, that the evidence failed to raise sufficient doubt as to his competence to require the trial court to

conduct a hearing on its own motion, and further that the evidence did not raise a "reasonable doubt" as to his sanity at the time of the offense. 22 Ill. 2d 162, 174 N. E. 2d 820 (1961). We denied certiorari. 368 U. S. 995 (1962). Thereupon, Robinson filed this petition for habeas corpus, which was denied without a hearing by the United States District Court for the Northern District of Illinois. The Court of Appeals reversed, 345 F. 2d 691 (1965), on the ground that Robinson was convicted in an unduly hurried trial without a fair opportunity to obtain expert psychiatric testimony, and without sufficient development of the facts on the issues of Robinson's insanity when he committed the homicide and his present incompetence. It remanded the case to the District Court with directions to appoint counsel for Robinson; to hold a hearing as to his sanity when he committed the alleged offense; and, if it found him to have been insane at that time, to order his release, subject to an examination into his present mental condition. The Court of Appeals directed that the District Court should also determine upon the hearing whether Robinson was denied due process by the state court's failure to conduct a hearing upon his competence to stand trial; and, if it were found his rights had been violated in this respect, that Robinson "should be ordered released, but such release may be delayed for a reasonable time . . . to permit the State of Illinois to grant Robinson a new trial." 345 F. 2d, at 698. We granted certiorari to resolve the difficult questions of state-federal relations posed by these rulings. 382 U. S. 890 (1965). We have concluded that Robinson was constitutionally entitled to a hearing on the issue of his competence to stand trial. Since we do not think there could be a meaningful hearing on that issue at this late date, we direct that the District Court, after affording the State another opportunity to put Robinson to trial on its charges within a reasonable time, order him

discharged. Accordingly, we affirm the decision of the Court of Appeals in this respect, except insofar as it contemplated a hearing in the District Court on Robinson's competence. Our disposition makes it unnecessary to reach the other reasons given by the Court of Appeals for reversal.[1]

I.

The State concedes that the conviction of an accused person while he is legally incompetent violates due process, *Bishop* v. *United States,* 350 U. S. 961 (1956), and that state procedures must be adequate to protect this right. It insists, however, that Robinson intelligently waived this issue by his failure to request a hearing on his competence at the trial; and, further, that on the basis of the evidence before the trial judge no duty rested upon him to order a hearing *sua sponte.* A determination of these claims necessitates a detailed discussion of the conduct of the trial and the evidence touching upon the question of Robinson's competence at that time.

The uncontradicted testimony of four witnesses [2] called by the defense revealed that Robinson had a long history of disturbed behavior. His mother testified that when he was between seven and eight years of age a brick dropped from a third floor hit Robinson on the head. "He blacked out and the blood run from his head like a faucet." Thereafter "he acted a little peculiar." The blow knocked him "cockeyed" and his mother took him to a specialist "to correct the crossness of his eyes." He also suffered headaches during his childhood, apparently stemming from the same event. His conduct became

---

[1] Nor do we pass on the contention that Robinson was denied his Sixth Amendment rights by the trial judge's refusal to issue summonses for material witnesses.

[2] These witnesses were Miss Willie Ceola Peterson, Robinson's mother; Mr. William H. Langham, his grandfather; Mrs. Helen Calhoun, his aunt; and Mrs. Alice Moore, a family friend.

noticeably erratic about 1946 or 1947 when he was visiting his mother on a furlough from the Army. While Robinson was sitting and talking with a guest, "he jumped up and run to a bar and kicked a hole in the bar and he run up in the front." His mother asked "what on earth was wrong with him and he just stared at [her], and paced the floor with both hands in his pockets." On other occasions he appeared in a daze, with a "glare in his eyes," and would not speak or respond to questions. In 1951, a few years after his discharge from the service, he "lost his mind and was pacing the floor saying something was after him." This incident occurred at the home of his aunt, Helen Calhoun. Disturbed by Robinson's conduct, Mrs. Calhoun called his mother about six o'clock in the morning, and she "went to see about him." Robinson tried to prevent Mrs. Calhoun from opening the door, saying "that someone was going to shoot him or someone was going to come in after him." His mother testified that, after gaining admittance, "I went to him and hugged him to ask him what was wrong and he went to pushing me back, telling me to get back, somebody was going to shoot him, somebody was going to shoot him." Upon being questioned as to Robinson's facial expression at the time, the mother stated that he "had that starey look and seemed to be just a little foamy at the mouth." A policeman was finally called. He put Robinson, his mother and aunt in a cab which drove them to Hines Hospital. On the way Robinson tried to jump from the cab, and upon arrival at the hospital he was so violent that he had to be strapped in a wheel chair. He then was taken in an ambulance to the County Psychopathic Hospital, from which he was transferred to the Kankakee State Hospital. The medical records there recited:

> "The reason for admission: The patient was admitted to this hospital on the 5th day of June, 1952,

from the Hines Hospital. Patient began presenting symptoms of mental illness about a year ago at which time he came to his mother's house. He requested money and when it was refused, he suddenly kicked a hole in her bar.

. . . . .

"Was drinking and went to the Psychopathic Hospital. He imagined he heard voices, voices of men and women and he also saw things. He saw a little bit of everything. He saw animals, snakes and elephants and this lasted for about two days. He went to Hines. They sent him to the Psychopathic Hospital. The voices threatened him. He imagined someone was outside with a pistol aimed at him. He was very, very scared and he tried to call the police and his aunt then called the police. He thought he was going to be harmed. And he says this all seems very foolish to him now. Patient is friendly and tries to cooperate.

. . . . .

"He went through an acute toxic episode from which he has some insight. He had been drinking heavily. I am wondering possibly he isn't schizophrenic. I think he has recovered from this condition. I have seen the wife and she is in a pathetic state. I have no objection to giving him a try."

After his release from the state hospital Robinson's irrational episodes became more serious. His grandfather testified that while Robinson was working with him as a painter's assistant, "all at once, he would come down [from the ladder] and walk on out and never say where he is going and whatnot and he would be out two or three hours, and at times he would be in a daze and when he comes out, he comes back just as fresh. He just

says he didn't do anything. I noticed that he wasn't at all himself." The grandfather also related that one night when Robinson was staying at his house Robinson and his wife had a "ruckus," which caused his wife to flee to the grandfather's bedroom. Robinson first tried to kick down the door. He then grabbed all of his wife's clothes from their room and threw them out in the yard, intending to set them on fire. Robinson got so unruly that the grandfather called the police to lock him up.

In 1953 Robinson, then separated from his wife, brought their 18-month-old son to Mrs. Calhoun's home and asked permission to stay there for a couple of days. She observed that he was highly nervous, prancing about and staring wildly. While she was at work the next day Robinson shot and killed his son and attempted suicide by shooting himself in the head. It appeared that after Robinson shot his son, he went to a nearby park and tried to take his life again by jumping into a lagoon. By his mother's description, he "was wandering around" the park, and walked up to a policeman and "asked him for a cigarette." It was stipulated that he went to the South Park Station on March 10, 1953, and said that he wanted to confess to a crime. When he removed his hat the police saw that he had shot himself in the head. They took him to the hospital for treatment of his wound.

Robinson served almost four years in prison for killing his son, being released in September 1956. A few months thereafter he began to live with Flossie May Ward at her home. In the summer of 1957 or 1958 Robinson "jumped on" his mother's brother-in-law and "beat him up terrible." She went to the police station and swore out a warrant for his arrest. She described his abnormalities and told the officers that Robinson "seemed to have a disturbed mind." She asked the police "to pick him up so I can have him put away." Later she went

back to see why they had not taken him into custody because of "the way he was fighting around in the streets, people were beating him up." She made another complaint a month or so before Robinson killed Flossie May Ward. However, no warrant was ever served on him.

The killing occurred about 10:30 p. m. at a small barbecue house where Flossie May Ward worked. At that time there were 10 customers in the restaurant, six of them sitting at the counter. It appears from the record that Robinson entered the restaurant with a gun in his hand. As he approached the counter, Flossie May said, "Don't start nothing tonight." After staring at her for about a minute, he walked to the rear of the room and, with the use of his hand, leaped over the counter. He then rushed back toward the front of the restaurant, past two other employees working behind the counter, and fired once or twice at Flossie May. She jumped over the counter and ran out the front door with Robinson in pursuit. She was found dead on the sidewalk.[3] Robinson never spoke a word during the three-to-four-minute episode.

Subsequently Robinson went to the apartment of a friend, Mr. Moore, who summoned the police. When three officers, two in uniform, arrived, Robinson was standing in the hall approximately half way between the elevator and the apartment. Unaware of his identity, the officers walked past him and went to the door of the apartment. Mrs. Moore answered the door and told them that Robinson had left a short time earlier. As the officers turned around they saw Robinson still standing where they had first observed him. Robinson made no attempt to avoid being arrested. When asked his address

---

[3] The Reverend Elmer Clemons was also shot and killed in the fracas. The indictment covering that offense was dismissed at the close of the trial in question.

he gave several evasive answers. He also denied knowing anything about the killing.[4]

Four defense witnesses expressed the opinion that Robinson was insane.[5] In rebuttal the State introduced only a stipulation that Dr. William H. Haines, Director of the Behavior Clinic of the Criminal Court of Cook County would, if present, testify that in his opinion Robinson knew the nature of the charges against him and was able to cooperate with counsel when he examined him two or three months before trial. However, since the stipulation did not include a finding of sanity the prosecutor advised the court that "we should have

---

[4] According to the testimony of an arresting officer the following exchange took place:

"I asked him what his name was and he said, 'My name is Ted.' I said, 'What is your real name?' And he said, 'Theodore Robinson.' Then I asked him—I told him he was under arrest and he said, 'For what?' I said, 'Well, you are supposed to be wanted for killing two people on the south side.' I asked him did he know anything about it. He said, 'No, I don't know what you are talking about.' So then I asked him where he lived and he said, 'I don't live no place.'

"I said, 'What do you mean you don't live no place?' He said, 'That's what I said.'

"So then pretty soon asked him again and he said, 'Sometimes I stay with my mother.' And I said, 'Where does she live?' He said, 'Some address on East 44th Street.'

"So then we took him on to the 27th District and while we were making the arrest slip, asked him again his address and he said he lived at 7320 South Parkway. That's about all he said. He didn't know anything about any killing or anything."

[5] His mother stated: "I think he is insane." Mrs. Calhoun testified as follows:

"Q. Do you have an opinion as to whether or not presently he is sane or insane?

"A. He is sick. He is insane.

"Q. First of all, do you have an opinion?

"A. Yes.

"Q. What is your opinion as to his present sanity? . . .

"A. He is mentally sick."

Dr. Haines' testimony as to his opinion whether this man is sane or insane. It is possible that the man might be insane and know the nature of the charge or be able to cooperate with his counsel. I think it should be in evidence, your Honor, that Dr. Haines' opinion is that this defendant was sane when he was examined." However, the court told the prosecutor, "You have enough in the record now. I don't think you need Dr. Haines." In his summation defense counsel emphasized "our defense is clear . . . . It is as to the sanity of the defendant at the time of the crime and also as to the present time." The court, after closing argument by the defense, found Robinson guilty and sentenced him to prison for his natural life.

II.

The State insists that Robinson deliberately waived the defense of his competence to stand trial by failing to demand a sanity hearing as provided by Illinois law. But it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his right to have the court determine his capacity to stand trial. See *Taylor* v. *United States,* 282 F. 2d 16, 23 (C. A. 8th Cir. 1960). In any event, the record shows that counsel throughout the proceedings insisted that Robinson's present sanity was very much in issue. He made a point to elicit Mrs. Robinson's opinion of Robinson's "present sanity." And in his argument to the judge, he asserted that Robinson "should be found not guilty and presently insane on the basis of the testimony that we have heard." Moreover, the prosecutor himself suggested at trial that "we should have Dr. Haines' testimony as to his opinion whether this man is sane or insane." With this record we cannot say that Robinson waived the defense of incompetence to stand trial.[6]

---

[6] Although defense counsel phrased his questions and argument in terms of Robinson's present insanity, we interpret his language as

We believe that the evidence introduced on Robinson's behalf entitled him to a hearing on this issue. The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial.[7] See *Thomas* v. *Cunningham,* 313 F. 2d 934 (C. A. 4th Cir. 1963). Illinois jealously guards this right. Where the evidence raises a *"bona fide* doubt" as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing pursuant to Ill. Rev. Stat., c. 38, § 104–2 (1963). *People* v. *Shrake,* 25 Ill. 2d 141, 182 N. E. 2d 754 (1962). The Supreme Court of Illinois held that the evidence here was not sufficient to require a hearing in light of the mental alertness and understanding displayed in Robinson's "colloquies" with the trial judge. 22 Ill. 2d, at 168, 174 N. E. 2d, at 823. But this reasoning offers no justification for ignoring the uncontradicted testimony

---

necessarily placing in issue the question of Robinson's mental competence to stand trial. Counsel was simply borrowing the terminology of the relevant Illinois statutes and decisions. The state law in effect at the time of Robinson's trial differentiated between lack of criminal responsibility and competence to stand trial, but used "insanity" to describe both concepts. Ill. Rev. Stat., c. 38, §§ 592, 593 (1963). The judges likewise phrased their decisions only in terms of sanity and insanity. See, *e. g., People* v. *Baker,* 26 Ill. 2d 484, 187 N. E. 2d 227 (1962). The statutory provisions and terminology in this field have now been clarified by the enactment of an article dealing with the "competency of accused." Ill. Rev. Stat., c. 38, §§ 104–1 to 104–3 (1963), as amended by the Code of Criminal Procedure of 1963. Even if counsel may also have meant to refer to the statutory provisions dealing with commitment for present insanity, Ill. Rev. Stat., c. 38, § 592 (1963), this fact would not affect the determination that counsel's words raised a question as to competence that the trial judge should have considered.

[7] Moreover, as the Court of Appeals stressed, the trial judge did not give Robinson an opportunity to introduce expert testimony on the question of his sanity. The judge denied counsel's request for a continuance of several hours in order to secure the appearance of a psychiatrist from the Illinois Psychiatric Institute.

of Robinson's history of pronounced irrational behavior. While Robinson's demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue. Cf. *Bishop* v. *United States,* 350 U. S. 961 (1956), reversing 96 U. S. App. D. C. 117, 120, 223 F. 2d 582, 585 (1955). Likewise, the stipulation of Dr. Haines' testimony was some evidence of Robinson's ability to assist in his defense. But, as the state prosecutor seemingly admitted, on the facts presented to the trial court it could not properly have been deemed dispositive on the issue of Robinson's competence.[8]

## III.

Having determined that Robinson's constitutional rights were abridged by his failure to receive an adequate hearing on his competence to stand trial, we direct that the writ of habeas corpus must issue and Robinson be discharged, unless the State gives him a new trial within a reasonable time. This disposition accords with the procedure adopted in *Rogers* v. *Richmond,* 365 U. S. 534 (1961). We there determined that since the state court had applied an erroneous standard to judge the admissibility of a confession, the "defendant should have the opportunity to have all issues which may be determinative of his guilt tried by a state judge or a state jury under appropriate state procedures which conform to the requirements of the Fourteenth Amendment." At 547–

---

[8] As defense counsel insisted in his closing argument:

"In this case, which is a very serious case, the defendant has been able to cooperate with counsel with some reservations. . . . However, I do not feel that this present . . . lucidity bears on the issue of his sanity at the time of the crime and his sanity at the present time. I think the words sanity and insanity, the words are legal terms. I think that presently Mr. Theodore Robinson is in a lucid interval. I believe that from the witness stand you have heard testimony to indicate and prove that Mr. Theodore Robinson is presently insane. . . ."

548. It has been pressed upon us that it would be sufficient for the state court to hold a limited hearing as to Robinson's mental competence at the time he was tried in 1959. If he were found competent, the judgment against him would stand. But we have previously emphasized the difficulty of retrospectively determining an accused's competence to stand trial. *Dusky* v. *United States,* 362 U. S. 402 (1960). The jury would not be able to observe the subject of their inquiry, and expert witnesses would have to testify solely from information contained in the printed record. That Robinson's hearing would be held six years after the fact aggravates these difficulties. This need for concurrent determination distinguishes the present case from *Jackson* v. *Denno,* 378 U. S. 368 (1964), where we held that on remand the State could discharge its constitutional obligation by giving the accused a separate hearing on the voluntariness of his confession.

If the State elects to retry Robinson, it will of course be open to him to raise the question of his competence to stand trial at that time and to request a special hearing thereon. In the event a sufficient doubt exists as to his present competence such a hearing must be held. If found competent to stand trial, Robinson would have the usual defenses available to an accused.

The case is remanded to the District Court for action consistent with this opinion.

*It is so ordered.*

MR. JUSTICE HARLAN, whom MR. JUSTICE BLACK joins, dissenting.

The facts now canvassed by this Court to support its constitutional holding were fully sifted by the Illinois Supreme Court. I cannot agree that the state court's unanimous appraisal was erroneous and still less that it was error of constitutional proportions.

The Court appears to hold that a defendant's present incompetence may become sufficiently manifest during a trial that it denies him due process for the trial court to fail to conduct a hearing on that question on its own initiative. I do not dissent from this very general proposition, and I agree also that such an error is not "waived" by failure to raise it and that it may entitle the defendant to a new trial without further proof. Waiver is not an apposite concept where we premise a defendant so deranged that he cannot oversee his lawyers. Since our further premise is that the trial judge should and could have avoided the error, a new trial seems not too drastic an exaction in view of the proof problems arising after a significant lapse of time.[1] However, I do not believe the facts known to the trial judge in this case suggested Robinson's incompetence at time of trial with anything like the force necessary to make out a violation of due process in the failure to pursue the question.

Before turning to the facts, it is pertinent to consider the quality of the incompetence they are supposed to indicate. In federal courts—and I assume no more is asked of state courts—the test of incompetence that warrants postponing the trial is reasonably well settled. In language this Court adopted on the one occasion it faced the issue, "the 'test must be whether . . . [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *Dusky* v. *United States,* 362 U. S. 402. In short, emphasis is on capacity to consult with counsel and to comprehend the proceed-

---

[1] The constitutional violation alleged is the failure to make an inquiry. In the more usual case, the simple claim that a defendant was convicted while incompetent during the trial, there is of course no proof of a constitutional violation until that incompetence is established in appropriate proceedings.

ings, and lower courts have recognized that this is by no means the same test as those which determine criminal responsibility at the time of the crime.[2]  The question, then, is not whether the facts before the trial judge suggested that Robinson's crime was an insane act but whether they suggested he was incompetent to stand trial.

The Court's affirmative answer seemingly rests on two kinds of evidence, principally adduced by Robinson to prove an insanity defense after the State rested its main case.  First, there was evidence of a number of episodes of severe irrationality in Robinson's past.  Among them were the slaying of his infant son, his attempted suicide, his efforts to burn his wife's clothing, his fits of temper and of abstraction, and his seven-week incarceration in a state hospital eight years before the trial.  This evidence may be tempered by the State's counterarguments, for example, that Robinson was found guilty of his son's killing and that alcoholism may explain his hospitalization, but it cannot be written off entirely.  The difficulty remains that while this testimony may suggest that Flossie May Ward's killing was just one more irrational act, I cannot say as a matter of common knowledge that it evidences incapacity during the trial.  Indeed, the pattern revealed may best indicate that Robinson did function adequately during most of his life interrupted by periods of severe derangement that would have been quite apparent had they occurred at trial.  The second class of data pertinent to the Court's theory, remarks by witnesses and counsel that Robinson was "presently insane," deserves little comment.  I think it apparent that these statements were addressed to Robinson's re-

[2] See *James* v. *Boles*, 339 F. 2d 431; *United States* v. *Kendrick*, 331 F. 2d 110; *Lyles* v. *United States*, 103 U. S. App. D. C. 22, 254 F. 2d 725.

sponsibility for the killing, that is, his ability to do insane acts, and not to his general competency to stand trial.[3]

Whatever mild doubts this evidence may stir are surely allayed by positive indications of Robinson's competence at the trial. Foremost is his own behavior in the courtroom. The record reveals colloquies between Robinson and the trial judge which undoubtedly permitted a reasonable inference that Robinson was quite cognizant of the proceedings and able to assist counsel in his defense.[4] Turning from lay impressions to those of an expert, it was stipulated at trial that a Dr. Haines, Director of the Behavior Clinic of the Criminal Court of Cook County, had examined Robinson several months earlier and, if called, would testify that Robinson "knows

---

[3] At the time Robinson's mother and Mrs. Calhoun made the statements noted in the Court's opinion, p. 383, n. 5, *ante,* they also stated Robinson did not know the difference between right and wrong. Counsel's statement, too, quoted by the Court at p. 386, n. 8, *ante,* was directed to acquittal, not postponement. See, n. 5, *infra.* Mrs. Moore, a family friend, responded to the question on Robinson's sanity by saying: "When he is in those moods, I think he is insane; when he is in those moods, because he is terrible."

[4] The Illinois Supreme Court stated in its opinion: "[T]he record reflects several instances where defendant displayed his ability to assist in the conduct of his defense in a reasonable and rational manner. Typical instances of when defendant displayed mental alertness, as well as understanding and knowledge of the proceeding, appear in his remarks to the court as follows: 'Your honor, they were on the State's witness list and the State said they have several witnesses. They produced two. For what reason, I don't know, but I am on trial here and 1 would like to be given every consideration, and I would like that the court be adjourned until tomorrow morning—to give me time to confer with counsel for the calling of witnesses.' Again, when discussing witnesses with the court, defendant said: 'Well, the police are contending that the clothes they have found in Moore's apartment was mine. That is the reason at the beginning of trial, I asked the attorney to have a pre-trial preliminary to determine the admissibility and validity of the evidence that the State was intending to use against me.'" 22 Ill. 2d, at 168, 174 N. E. 2d, at 823.

the nature of the charge and is able to cooperate with his counsel." The conclusive factor is that Robinson's own lawyers, the two men who apparently had the closest contact with the defendant during the proceedings, never suggested he was incompetent to stand trial and never moved to have him examined on incompetency grounds during trial; [5] indeed, counsel's remarks to the jury seem best read as an affirmation of Robinson's present "lucidity" which would be highly peculiar if Robinson had been unable to assist properly in his defense. See p. 386, n. 8, *ante,* of the Court's opinion.

Thus, I cannot agree with the Court that the requirements of due process were violated by the failure of the trial judge, who had opportunities for personal observation of the defendant that we do not possess, to halt the trial and hold a competency hearing on his own motion.

Several other grounds have been urged as a basis for habeas corpus relief for Robinson. These other grounds are understandably not discussed in the Court's opinion, and I think it is sufficient for me to say I do not believe that they warrant further proceedings. In my view, the Court of Appeals should be reversed and the District Court's dismissal of the petition reinstated.

---

[5] The record in my view does not bear out any suggestion that Robinson's counsel apprised the trial judge that he believed Robinson incompetent to stand trial, even granting that "insane" was a synonym for "incompetent" under then-existing state law (pp. 384–385, n. 6, *ante*). Under Illinois law, as one would naturally expect, incompetence at the time of trial has been a ground not for acquitting the defendant but for postponing his trial; and nowhere in the record does Robinson's counsel even hint to the judge that he believes the trial should be deferred or abated because his client is not fit to continue. The ready explanation for counsel's references to "present insanity," apart from emphasizing Robinson's general lack of criminal responsibility, is that Illinois law provided that one acquitted on grounds of insanity at the time of the crime shall by the same verdict be found cured of or still afflicted with "such insanity" and committed in the latter instance. Ill. Rev. Stat., c. 38, § 592 (1959).