**Guenter SCHOELLER, Petitioner,**

v.

**Walter DUNBAR, Director, California
Department of Corrections, et al.,
Respondents.**

**No. 47002.**

United States District Court,
N. D. California.

July 29, 1968.

Treuhaft, Walker & Burnstein, Malcolm Burnstein, Oakland, Cal., for petitioner.

Thomas C. Lynch, Atty. Gen. of California, Jerome C. Utz, Deputy Atty. Gen., San Francisco, Cal., for respondents.

### MEMORANDUM DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

OLIVER J. CARTER, District Judge.

This is a petition for a writ of habeas corpus. Petitioner is presently incarcerated in the California State Prison at San Quentin pursuant to a conviction on November 20, 1964, for second degree murder after a plea of guilty. An order to show cause was issued, and an evidentiary hearing has been held by this Court at which the defendant was present and represented by counsel.

On this petition two basic points have been raised. Petitioner argues that at the time he entered his plea of guilty he was mentally incompetent to do so. Second, he argues that he was denied due process in the proceedings which led to his conviction because the trial court failed to hold a hearing to determine petitioner's competency to proceed when the trial court had in fact doubt, or as a matter of law was required to entertain doubt as to petitioner's sanity, which hearing is required by California Penal Code, § 1368 and by the petitioner's constitutional rights under Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966).

The following is the chronological background of the facts in this case. The crime for which petitioner was convicted took place on April 24, 1964, and petitioner turned himself in to the authorities the same day. He was placed in custody at San Francisco County Jail. On May 15 petitioner was arraigned on charges of murder and assault with a deadly weapon with intent to commit murder (for the shooting of a second person who survived). The killing was the climax to an involved love affair with the girl he killed. The girl had rejected him and petitioner was attempting to force her to fly to Reno, Nevada, and to marry him either by threatening to shoot

himself or, by the prosecution's theory, by threatening to shoot her.

During most of the time relevant to this inquiry until his treatment at California State Medical Facility at Vacaville in September, petitioner acted very depressed and expressed a desire to be sentenced to die in the gas chamber.

On May 29 the physician at the county jail certified petitioner to the Detention Ward of San Francisco County General Hospital for treatment following a diagnosis that petitioner was then "suffering from suicidal tendencies and * * * [was] considered a suicide risk." P's Exh. 3. While at the hospital petitioner was examined by two medical examiners, and they made the following observations.

"Plead guilty to a charge of murdering his girl friend [and] asked for death sentence. Threatens to kill self if he is not given death sentence.

"Had thought of suicide for some weeks prior to his offense.

"Told also of suspecting g. f. might be in danger of being taken in by her lesbian girl friends. Decided to save her from them.

"Friendly, alert, cooperative but states it will take some time to tell story. [D]oes not feel he is M.I. [mentally incompetent]. [D]oesn't wish to talk in Wd. [ward]

"Feels he deserves to die for what he did. Nothing more to live for. Tells of girl friend breaking off _____ [with] him. Decided to make one more effort to get her to come back to her [sic]—[and] if she wouldn't he would kill himself. [W]rote will & put affairs in order—also bought 2 tickets to Reno. Went to her apt [apartment] _____, [with] revolver. She jilted him again—and he doesn't remember just what happened next but evidently he killed her instead—Then intended to kill self, but changed mind and decided to accept legal penalty [illegible] Hopes for ultimate penalty.

"Not presently psychotic, but potential suicide risk.
"Dated: 6/4, 1964     [signed] P. O. Poliak
    Medical Examiner
    [signed] S. Leland
D's Exh. G.     Medical Examiner."

---

An examination by another doctor dated June 4 reads in part as follows:

" * * * Patient is very reluctant to discuss his reasons for killing the girl or for wanting to die, asks that he be 'judged legally sane'. Says he is not suicidal at present but will find some way to kill himself if not sentenced to die.

"M.S.:-rational, depressed
'there's nothing to live for' but very vague about his reasons
Oriented OK abstraction-good
No apparent delusions or halluc.

"Imp: Depression with suicidal tendencies.

? possible schiz.

" * * * " P's Exh. 1, pp. 2 and 3.

A third observation from the hospital records, dated June 4, is as follows:

"6/4/64 Vague & secretive about murder & reasons, seems schzoid & depressed, don't know if psychotic or not underneath, mild, not cooperative enough with exam & no history available." P's Exh. 1, p. 2.

The contents of the first report were transmitted to the trial court, but there is nothing to indicate that the complete hospital records were ever before the trial court.

The public defender's office represented petitioner at first, but on June 24, private counsel, Mr. Jack Berman, was retained. Mr. Berman represented petitioner throughout the remainder of the criminal proceedings except for a brief period in September when he was discharged by petitioner. Mr. Berman testified as a witness before this Court in this habeas corpus proceeding.

Throughout his contact with the petitioner, Mr. Berman found him to be coherent and had no trouble communicating with him. Petitioner indicated to Mr. Berman that he definitely did not want to enter an insanity plea, that he was opposed to being examined by psychiatrists, and that he preferred being executed to being sent to a mental institution. Mr. Berman had extended conversations with petitioner regarding petitioner's background, the events leading up to the shooting, the elements of and the penalties for the crimes from manslaughter to first degree murder, and the elements of the crime of assault with intent to commit murder. Mr. Berman never had any doubt that petitioner was fully conscious and understood the nature of the legal proceedings that transpired

and understood his conversations with Mr. Berman. Mr. Berman did feel that petitioner was depressed the whole time and that he was suffering from a mental illness.

In early August Mr. Berman arranged for the petitioner to be examined by a private psychiatrist, Dr. Faircloth, at the County Jail. After reviewing the findings of the psychiatrist, Mr. Berman concluded that there was no insanity defense available, and neither he nor the psychiatrist felt that the petitioner's mental illness was sufficiently acute that he was mentally incompetent to understand the proceedings or cooperate in his defense with his lawyer.

On August 24 petitioner pleaded guilty to a charge of second degree murder, and the assault charges against him were dropped. On August 28 the County Jail physician again had petitioner sent to San Francisco General Hospital for study because petitioner "was suffering from suicidal tendencies and * * * [was considered] a definite suicidal risk." P's Exh. 4. The hospital report following a mental examination at this time is as follows:

"MENTAL EXAMINATION

General attitude and behavior  Relates fairly well
Stream of talk  Spontaneous
Emotional status (affect & Mood)  Depressed
Content of thought and abnormal mental trends
(record abnormal content, delusions or hallucinations, if present)
 None
Mental grasp and capacity
 Attention and Apprehension  Good
 Orientation (record answers, if not oriented)
      Well-oriented
General Intelligence  Above-average
Memory  ·Good
Insight and judgment  Fair

"IMPRESSION

 (1) Reactive depression in obsessive-compulsive personality

"RECOMMENDATIONS

 (1) Institution"  P's Exh. 11, p. 5

On September 8 there was a hearing during which there was some discussion regarding petitioner's competency, and this is quoted below:

"*Defendant Schoeller*: There is one last point I would make a part of the record, and that is, contrary to the belief of some people my reasons for entering a guilty plea are not due to the fact that I am suffering from a quote 'guilt complex' unquote or a psychotic desire to be punished: far from that.

Indeed, as far as the crime itself is concerned I do not feel any criminal responsibilities since it was an act which was beyond anything I ever intended or consciously did.

The reasons for my entering such a plea are of a, let's call it personal, philosophical nature which I do not wish to disclose, and I believe that is about all; and if now Your Honor would please sentence me and get this matter over with.

"*The Court*: Are you saying that you didn't enter the plea because you are not guilty?

"*Defendant Schoeller*: No, I didn't say that. I have entered an official plea of guilty.

"*The Court*: I understand that, but you say you entered it for psychological and philosophical reasons and that you do not consider yourself responsible. What is the status here now? I thought you pleaded guilty of second degree murder because you were guilty. Is that true or not?

"*Defendant Schoeller*: Please accept the plea. That's all I wish to say, sir. I do not wish to cause any scenes. Please just get it over with. I have had five months now in which to consider every possible aspect of this and I am, if anything, very tired. Please, would you impose the sentence and let me go?" D's Exh. C, pp. 16 and 17.

There follows a long explanation by petitioner of his motives for wanting to be executed, or in the alternative to be sentenced without the Vacaville study, and the Court interrupts as follows:

"*The Court*: The only thing that concerns me is whether or not that original plea was acceptable from a legal viewpoint.

Do you, Mr. Berman,—you are not [sic] longer his attorney, but you were then. Now, you have discussed this with me and you have advised me on more than one occasion previous to this time that the medical information that you had was such that there was no basis for a plea of not guilty by reason of insanity, is that so?

"*Mr. Berman*: That is correct.

If your Honor please, both the medical records, which I examined from the County Hospital from his previous commitment back in the latter part of May and the early part of June, plus my own psychiatrist, Dr. Faircloth, both of them indicate that there was no basis whatsoever for an insanity plea. However, I did advise the Court that I felt the man was mentally ill in a medical sense.

\* \* \* \* \* \*

"*Mr. Berman*: I feel as a lawyer that the plea was properly entered in terms of the man's competence in a 1368 proceeding [the California provision for a hearing to determine competency to proceed is California Penal Code § 1368].

He understood what he was doing. It was discussed at great length. We even had a two-hour philosophical discussion on what Mr. Schoeller has discussed with the Court.

I do feel that—as I expressed to the man informally—that the man would benefit by a commitment to Vacaville. I think certainly that commitment and the studies made there would indicate whether the legal opinion I have, which is not based on any personal medical knowledge, but on the hearsay that I have gathered from the psychiatrists,

would confirm whether I am right in saying that the man was fully cognizant of his actions under the provisions of 1368." D's Exh. C, pp. 23–25.

Also, on September 8 the Superior Court ordered that petitioner be given a ninety-day study at the California State Medical Facility at Vacaville under California Penal Code, § 1203.03. This section is intended primarily as a sentencing aid in cases where probation is a possibility. However, in this case even though the trial judge had no intention of granting probation, he felt that the facilities for treatment at Vacaville were superior to those at regular penal institutions and that some good preliminary treatment and diagnosis would aid petitioner's adjustment to penitentiary life and start him on an earlier road to recovery. The final report from Vacaville that followed this more extensive treatment is quoted below to the extent it bears on the question of his mental competency at that time:

"Social, psychological, and psychiatric examinations indicate that he has superior intelligence and is not suffering from any intellectual impairment. He is in good contact with reality and is not mentally ill. The offense for which he has been convicted is a product of a psychoneurotic condition engendered by early life experiences. Because of the emotional deprivation he experienced during the formative periods of his life an eventual breakdown could have almost been predicted. The overt rejections he experienced at the hands of his father have made it difficult for him to relate on an affective level to others. His emotional conflict arises from his need for love and his subconscious feeling that no one will ever really love him for himself. As he matured he became more withdrawn and personally isolated and endeavored to repress his underlying hostility and rage at his father and the circumstances of his life. His psychological adjustment was brittle, however, and broke down under the cumulative pressures of financial, academic and emotional stress. His sister advises that he probably never intended to marry the victim, and he certainly made no strong effort to do so when he had the opportunity. Because of his overly rigid and compulsive nature, however, he was emotionally unable to tolerate the withdrawal of her affection. Her overt rejection was not only a repetition of earlier experiences but was even more severe because of the threat to his masculinity caused by her preference for female acquaintances he suspected of being homosexuals. The result was an emotional explosion culminating in an act which is even more impossible for him to accept because of his extremely rigid approach to life. The amnesia that he claims for the event is probably quite valid and is characteristic of so-called 'dissociative reactions' in which repressed impulses and anxiety is discharged or deflected into a symptomatic expression which consists of a blotting out of awareness of unpleasant or intolerable realities. This was followed by a period of intense depression and morbid preoccupation with guilt feelings which could only, in his opinion, be atoned for by eliminating himself. The acute phase of this disorder is now past. At the present time he is by no means as emotionally distraught as he was previously and has quite rapidly returned to a reasonably normal emotional balance. It must be recognized, however, that he still has an underlying emotional disturbance of considerable magnitude and that if he is to accomplish anything with his life he requires intensive psychiatric treatment. It is unlikely that an agressive episode of this nature will recur unless a similar set of circumstances should develop. He has no history of antisocial or criminalistic identification and he has excellent potential but he needs psychiatric treatment in order to develop more insight and an ability to cope with his emotional problems more

effectively before they reach an acute stage. In the opinion of the clinical staff commitment to the Department of Corrections does not appear to be necessary for the protection of society, nor is he in need of the care, supervision and training program provided by correctional institutions. Apart from the legal and social aspects of this case there is nothing of a clinical nature to contraindicate his ability to adjust and conform to the responsibilities of probation, provided he obtains intensive psychiatric treatment and it is available in the community." P's Exh. 2, pp. ii and iii.

On November 20 petitioner was sentenced under the provisions of California law for second degree murder and he is presently serving that sentence.

Just prior to the hearings before this Court petitioner was interviewed by a psychiatrist, Dr. Blinder. Dr. Blinder also examined most of the records from the 1964 criminal proceedings and the hospital records. He testified that it was his conclusion that petitioner was at the time he entered his plea of guilty mentally incompetent to do so. The area of incompetence was that petitioner at that time could not have and did not have any knowledge regarding the motives for and the basic causes of his act of shooting his girl friend and the landlady. However, Dr. Blinder did testify that petitioner's incompetency was well hidden behind a mass of rational conduct.

The trial judge who presided over almost all of petitioner's sentencing proceedings testified that during all of these appearances petitioner exhibited lucidity and superior intelligence, but that he was clearly depressed.

■ This Court has concluded that most of the basic evidence before it is not substantially conflicting. Only the conclusions to be drawn from it are disputed. On the issue of whether the petitioner was denied due process because the trial court failed to hold a hearing to determine mental competency to proceed this Court finds as follows: The test to be applied is "whether, no less on hindsight than by foresight, there were elements of such indication in the situation as, if proper notice had been taken of them, could present a substantial question of possible doubt as to [petitioner's] competency to stand trial." Rhay v. White, 385 F.2d 883, at 886 (9th Cir. 1967). While petitioner expressed his desire to be sentenced to capital punishment for his crime, attempted suicide several times, and was considered extremely depressed and mentally ill by all who observed him, these facts were not such as to present a substantial question of doubt as to petitioner's competency to proceed when at the same time petitioner was acting rationally, speaking lucidly, a psychiatric report from San Francisco County Hospital described him as "presently sane (but depressed)", D's Exh. F [1], Mr. Berman had indicated to the sentencing judge the fact that petitioner had been examined by a psychiatrist and that from both the psychiatrist's and Mr. Berman's points of view there was no problem with petitioner's competency to proceed, and the petitioner himself was vigorously protesting any suggestion that he was incompetent.

Petitioner introduced some abbreviated, handwritten notes that were taken down by Mr. Berman during a telephone conversation with the private psychiatrist following his examination of petitioner. The notes are as follows:

"8/8    Faircloth results
        No psych defense-
        Very disturbed
        Poss. quite crazy
        Hyper-rational man

---

[1] While this report is undated, it seems to have been sent to the trial judge following the first examination at S. F. Cty. Hosp. between May 29 and June 11, because it is signed by the same two doctors who made up the report dated June 4, D's Exh. G. In any case it would have been in the judge's possession by the September 8 hearing when the discussion of petitioner's competency took place.

Consid. suicide potential
Might kill someone else
Does have some awareness of fact he might kill again.
Superior man
Can't know what is going on in his head
Doesn's know if psychotic or not
Very disturbed. Diff. to exam. 90 day Vacaville—" P's Exh. 10

These notes to some extent contradict the direct testimony of both Mr. Berman and the psychiatrist, Dr. Faircloth, by indicating that petitioner was suffering from a more severe mental illness than that described by the testimony of the two men on the witness stand. However, these notes do not bear expressly on the issue of competency to proceed. Also these notes were not before the trial court; indeed, regardless of what they meant to Mr. Berman when he wrote them, at the time he discussed the matter of competency with the trial court, he represented to the trial court that no problem of competency was indicated by the psychiatrist's report. Finally, this Court considers the force of these variations to be outweighed by all the remaining evidence before this Court showing petitioner competent to proceed: the more formal psychiatric reports of the County Hospital and the Vacaville report, plus petitioner's general appearance, attitude, and ability to communicate during the 1964 proceedings.

With regard to the petitioner's argument that the conversation, quoted above, between petitioner, the trial judge, and Mr. Berman is by itself sufficient evidence of the trial judge's doubt as to petitioner's sanity and competence to proceed, this Court interprets those passages to indicate that the judge did express some doubt as to the voluntariness of petitioner's plea (an issue not raised in these proceedings except within the context of the issue of competency to proceed), but never expressed any doubt as to petitioner's competency to proceed. This latter subject was only raised by petitioner's counsel as an additional response to the subject of the possibility of a plea of not guilty by reason of insanity.

Dr. Blinder's testimony that whatever the extent of petitioner's incompetency, it was hidden, supports the conclusion of this Court that no objective symptoms of incompetency sufficient to raise a substantial doubt as to petitioner's competence existed.

The facts in this case are distinguishable from those in Robinson v. Pate, *supra*, and Rhay v. White, *supra*. The present petitioner had no previous record of mental illness, and from the time of his treatment at Vacaville to the present there has been no serious mental illness. The petitioner in Robinson v. Pate, *supra*, had a long history of seriously disturbed behavior, and the issue of his sanity at the time of trial was raised by his counsel. The petitioner in Rhay v. White, *supra*, all through his trial suffered mental problems which manifested themselves to both counsel and the trial judge. He also had a long history of mental disturbances including repeated outbursts of violence and other strange incidents which had occurred in his general, behavioral conduct.

Additionally, petitioner has failed to prove that he was in fact mentally incompetent at the time he entered his plea of guilty, or at any of the other proceedings. Dr. Blinder's testimony, while considered by this Court to be honest and forthright, must be given much less weight than the opinion of the doctors who examined the petitioner back in 1964 during the relevant time. Petitioner's own inability to remember the events from the time just before the killing until his treatment at Vacaville is considered by this Court to be more of a common defensive reaction to an intolerably unpleasant series of events than a significant indication that he was not competent during the trial court proceedings.

Finally, the offense with which defendant was charged carried the death penalty as a possible end result if the defendant entered a plea of not guilty by reason of insanity and lost. His plea to

second degree murder eliminated the possibility of the death penalty. Mr. Berman as competent defense counsel was very much aware that the acceptance of the proposed plea of second degree murder by the trial judge depended on an interpretation of the record as it then appeared to be. Mr. Berman and Schoeller were fully conscious of the hazards of a hearing under section 1368 of the Penal Code where testimony would be taken concerning the background of the offense so far as it went to the mental competency of the defendant. With the psychiatric opinions they had concerning the probable finding of mental competence to proceed, it was tactically a very hazardous decision to ask for a 1368 examination. The evidence produced at such a hearing might have caused the trial judge to refuse to accept the plea to second degree murder, and require a plea to a first degree murder, which charge was then pending. Having made that tactical decision on the basis of competent legal and psychiatric advice, Schoeller should not now be permitted to escape the consequences of his decision which was made to limit the punishment which could be imposed.

Accordingly, it is ordered that this petition for a writ of habeas corpus be, and the same is hereby denied.