748 F.2d 481
 Bobby Ray SPEEDY, Appellant,
v.
Donald W. WYRICK, Warden, Missouri State Penitentiary,
Jefferson City, Missouri and John Ashcroft,
Attorney General, State of Missouri, Appellees.
 No. 83-2506.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1984.
Decided Nov. 15, 1984.
 
 Brian S. Riepen, St. Louis, Mo., for appellant.
 Rosalynn Van Heest, Jefferson City, Mo., for appellees.
 Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 On June 25, 1973, Bobby Ray Speedy pled not guilty by reason of mental defect or disease to the shotgun murders of his ex-wife's boyfriend and another man. On November 8, 1973, Speedy was convicted of both murders by a jury in the Circuit Court of St. Louis County, Missouri. Speedy appealed his conviction in the Missouri courts on several grounds, one of which was the claim that he was denied due process by the failure of the trial court to raise sua sponte the issue of Speedy's competency to stand trial. After exhausting his remedies in the Missouri courts, Speedy filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Missouri on September 9, 1981. The District Court dismissed the petition on March 9, 1982. This Court reversed the dismissal and remanded the case for an evidentiary hearing on the question of whether the trial court should have raised sua sponte the issue of Speedy's competency. Speedy v. Wyrick, 702 F.2d 723 (8th Cir.1983). The District Court[1] then conducted an evidentiary hearing, found that there was not substantial evidence raising a reasonable doubt as to Speedy's competence at the time of trial, and denied Speedy's petition. Speedy appeals from the decision of the District Court.
 
 I.
 
 2
 The events leading up to the murders for which Speedy was convicted are not in dispute. Speedy married Judy Speedy in 1954. He became an elementary school teacher for the Hazelwood school district around 1965 and was described by friends and colleagues as a cheerful person and a very good teacher. Though the Speedys were divorced in May 1972, largely due to Mr. Speedy's infidelity, Judy Speedy characterized the divorce as friendly. Both Judy and Bobby Speedy became involved with other persons.
 
 
 3
 Speedy's ex-wife and friends began to notice a change in him shortly after the divorce. He became depressed and despondent. Two months after the divorce, Speedy went to his ex-wife's house while she was gone and ripped or smashed everything that was hers. Speedy again visited his ex-wife during Christmas, grabbed her hands, and caused her to scratch his face and beat him about the head with an ashtray. A week later, Speedy appeared at her house again, held a gun to his son's head, and threatened to kill him, but then put down the gun and sat down to watch television. Judy Speedy took Speedy to see psychiatrists several times. She also talked to a lawyer about having Speedy committed, but was told she probably could not succeed.
 
 
 4
 Speedy's girlfriend also worried about his increasingly strange behavior. Speedy repeatedly threatened suicide, had beaten her both with his hands and a gun, and had broken his wrist by punching a wall. Other teachers at the school started to worry about Speedy when he began to break down and cry in front of his sixth grade class.
 
 
 5
 On March 10, 1973, Judy Speedy went to a dinner party at the apartment of her boyfriend, Gordon Meek. Speedy appeared on the balcony of the apartment with a shotgun. While Judy Speedy went to call the police, Speedy entered the apartment and shot and killed both Gordon Meek and Clark Brown.
 
 
 6
 Prior to trial, Speedy was examined by three different psychiatrists. Each psychiatrist submitted a written report before trial to the trial court. The defense psychiatrist, Dr. Blackman, interviewed Speedy a number of times. He concluded on May 1, 1973, after four interviews, that Speedy was suffering from a mental defect or disease in that his extreme degree of depression and suicidal preoccupation made it impossible for him to conform his behavior to the expectation of the law. Nevertheless, Dr. Blackman concluded that Speedy was probably competent to stand trial. The court-appointed psychiatrist, Dr. Bergmann, evaluated Speedy on July 2, 1973 and found that Speedy showed evidence of depression of psychotic intensity and was in urgent need of psychiatric treatment in a closed facility because of his suicidal tendencies. Dr. Bergmann did not address the issue of Speedy's competence to stand trial. The psychiatrist for the prosecution, Dr. Shuman, opined on July 30, 1973 that Speedy probably would be in a hospital receiving psychiatric therapy if he were a private patient and should get psychiatric care to clear up his severe depression. Nevertheless, Dr. Shuman stated that Speedy was not psychotic at the time of the shooting and that there was no evidence of the presence of any delusions, illusions, hallucinations, or the like. Dr. Shuman also stated that Speedy would be able to stand trial and could assist his attorney in his defense.
 
 
 7
 At trial, Speedy's attorney did not contest the fact that Speedy had fired the shots that killed Meek and Brown. He attempted instead to show that Speedy was not guilty by reason of mental defect or disease. To this end, his examination and cross-examination of witnesses, including Speedy's ex-wife, friends, fellow teachers, and acquaintances was devoted to presenting Speedy's irrational and bizarre behavior. Although Speedy's attorney repeatedly emphasized the oddness of Speedy's past behavior, he never moved for a competency hearing nor indicated that he had any difficulty in communicating with Speedy.
 
 
 8
 All three psychiatrists who submitted pre-trial reports testified at trial in connection with Speedy's insanity defense. None of the psychiatrists changed his diagnosis of Speedy in any material way from his pre-trial report. Dr. Bergmann testified that Speedy suffered from an affective disorder of psychotic intensity and was at times out of contact with reality. Dr. Blackman stated that Speedy was suffering from severe depression (though not necessarily of a psychotic nature), but that he was probably psychotic at the time of the shooting and at times was totally oblivious to others and to events around him. Dr. Shuman felt that Speedy was not psychotic before, during, or after the shooting, but did state that Speedy was sick and suicidal. None of the psychiatrists testimonially addressed the issue of Speedy's competence to stand trial. The jury rejected Speedy's plea of not guilty by reason of mental defect or disease and convicted him.
 
 
 9
 At the habeas hearing, in addition to recounting much of what had transpired before the murder trial and the testimony given during the trial, witnesses described Speedy's behavior at trial. Three of Speedy's friends testified that Speedy had sat with his head in his hands, cried constantly, and generally acted as if he wasn't there. Habeas Transcript at 17-31. The court-appointed psychiatrist, Dr. Bergmann, testified at the habeas hearing that during Speedy's trial, Speedy seemed to be aware that he was in a courtroom and that there was a trial going on. Id. at 11. He added that at the trial Speedy was terribly depressed and his cognitive functions were probably impaired, but could not opine whether Speedy was capable of communicating with his attorney. Id. The prosecutor, Thomas Dittmeier, remembered Speedy as sitting with his head in his hands while the jury was in the courtroom, but as occasionally having "free dialogue" with the psychiatrists while the jury was out. Id. at 36. Dittmeier did not recall whether Speedy cried during the trial and couldn't "be positive" that Speedy had ever spoken with his attorney. Id. at 37. He also stated that there "wasn't any kind of bizarre behavior ... or anything out of the ordinary in this case" so that he "didn't feel ... we needed any hearings." Id. at 48. The state trial judge, Circuit Judge William Corrigan, stated that he was not sure he had read any of the psychiatric evaluations before the trial. He thought that Speedy seemed somewhat "sullen" in the courtroom and somewhat more outgoing outside the presence of the jury. Id. at 55. He couldn't recall whether Speedy ever spoke with his attorney but he did state that Speedy did nothing that would indicate that he was "violent, bizarre, crazy or anything else." Id. at 56.
 
 II.
 
 10
 The conviction of an accused person while that person is legally incompetent violates due process. See Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The Supreme Court has dealt with the issue of under what circumstances a trial court sua sponte must order a competency hearing in a criminal trial in Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), and Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Neither case prescribes precise guidelines with respect to the nature or quantum of evidence necessary to require a court to order a competency hearing on its own motion. Rather, the Court held in both Robinson and Drope that the specific factual circumstances of each case raised a reasonable doubt as to competency and that under those circumstances the failure of the respective trial judges to order a competency hearing denied Robinson and Drope their right to a fair trial. Thus, any meaningful comparison of Speedy's case with the Robinson and Drope cases must begin with an analysis of the facts in those two cases.
 
 
 11
 In Pate v. Robinson, Robinson had been convicted of the shotgun murder of his wife. Robinson had a long history of irrational behavior, which included walking about in a daze, seeing animals such as snakes and elephants, trying to burn his wife's clothing, and, four years prior to killing his wife, shooting and killing his son and shooting himself in the head. The murder of his wife occurred when Robinson, without apparent motive or explanation, walked into the restaurant where she worked and shot her.
 
 
 12
 Four witnesses (Robinson's mother, his grandfather, his aunt and a family friend) testified at trial that Robinson was insane. The prosecution offered to introduce the testimony of a psychiatrist who would have testified that, based on an examination two or three months before trial, Robinson was sane and competent to stand trial.
 
 
 13
 Robinson was lucid and articulate in several interchanges with the trial judge. He was found guilty of murder. In review of his petition for writ of habeas corpus, the Supreme Court ordered Robinson to be retried or set free, stating that Robinson's lucidity at trial was not sufficient reason to ignore the uncontradicted evidence of his history of irrational behavior. "Robinson's demeanor at trial might be relevant to the ultimate decision as to his sanity, [but] it cannot be relied upon to dispense with a hearing on that very issue." 383 U.S. at 386, 86 S.Ct. at 842.
 
 
 14
 In Drope v. Missouri, Drope had participated with four acquaintances in the rape of his wife. Drope had been examined by one psychiatrist who found that Drope had no sign of any delusions, illusions, hallucinations, obsessions, compulsions, or phobias. Drope's counsel had asked for further testing, arguing that Drope was not of sound mind, but did not specifically request a competency hearing. Because of counsel's procrastination and lack of preparedness, the trial court overruled Drope's request for further psychiatric evaluation.
 
 
 15
 Drope's history of irrational behavior included rolling down the stairs, trying to choke his wife, the gang rape, and other bizarre abuses of his wife. Drope's wife testified at trial that Drope had engaged in odd behavior and had tried to choke her. Before the second day of trial, Drope shot himself in the stomach. The trial was conducted in his absence and Drope was convicted.
 
 
 16
 In affirming Drope's conviction, the Missouri Court of Appeals emphasized the psychiatrist's report that Drope suffered from no illusions or hallucinations and that he was well-oriented in all respects. In a unanimous opinion, the United States Supreme Court reversed, finding that the record revealed a failure to give proper weight to the evidence suggesting incompetence. The testimony of Drope's wife at trial, the evidence of past irrational behavior, and the "bona fide" suicide attempt created a reasonable doubt of competency, and thus the trial court should have ordered an evidentiary hearing on that issue.
 
 III.
 
 17
 We first note that the evidence of Speedy's prior irrational conduct is not unlike the conduct examined in Robinson and Drope. We heed the admonition of the Supreme Court in Robinson that in determining whether the evidence of incompetency rises to a level requiring the trial court to order sua sponte a hearing, a court is not permitted to disregard undisputed evidence of past irrationality in favor of evidence tending to show competence. We also note, however, that unlike the trial courts in Robinson and Drope, it was not the trial court in the instant case which minimized the inferences to be drawn from Speedy's prior irrational behavior. Three psychiatrists interviewed Speedy prior to trial. Both the defense psychiatrist and the psychiatrist for the prosecution expressed an opinion that Speedy was competent to stand trial.[2] Both did so with knowledge of Speedy's prior irrational acts.[3] Both of these psychiatrists testified at trial and neither changed his opinion.
 
 
 18
 In Drope, on the other hand, there never was a professional finding of competency. And in Robinson, there is no indication that the psychiatrist who reported that Robinson was sane and competent four months before trial had any evidence of Robinson's irrational acts before him when he made his diagnosis. Furthermore, the psychiatrist in Robinson did not appear at trial; consequently the basis for his diagnosis was not subject to cross-examination. Neither could he compare his diagnosis of Robinson's sanity and competence four months before trial with Robinson's attitude and demeanor at trial and thereby have a chance either to reaffirm his diagnosis as having present validity or retract his diagnosis in the face of new evidence suggesting incompetency. Thus, in contrast to Drope where the evidence of irrational behavior was not counterbalanced by a professional finding of competency, and in contrast to Robinson where the evidence of irrational behavior was offset only by a four-month old psychiatric evaluation that apparently was made without knowledge of Robinson's prior irrational acts, the unanimous pre-trial professional findings of competency in Speedy's case were made with due consideration of Speedy's irrational behavior and were not retracted by the psychiatric witnesses when they testified at trial.
 
 
 19
 Another factor requiring consideration is that Speedy allegedly attempted suicide while in prison awaiting trial. As the Supreme Court pointed out in Drope, a suicide attempt may evidence a high degree of instability. Yet, the Court also noted in Drope that "a suicide attempt need not always signal 'an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion.' " 420 U.S. at 181 n. 16, 95 S.Ct. at 908 n. 16 (quoting Greenberg, Involuntary Psychiatric Commitments to Prevent Suicide, 49 N.Y.U.L.Rev. 227, 236 (1974)). In the instant case, the court-appointed psychiatrist knew of the suicide attempt when he wrote his report. That report did not question Speedy's competence. The defense psychiatrist tried to have Speedy transferred to a hospital after hearing of the attempt. It is significant that both of these psychiatrists subsequently testified at trial and neither of them raised the belief that Speedy might have become incompetent. It is equally significant that at trial the defense psychiatrist reaffirmed his diagnosis of Speedy. That diagnosis, as evidenced by the written report, included a finding that Speedy was competent. Thus, Speedy's case is readily distinguishable from Drope.
 
 
 20
 Drope is further distinguishable from the present case in that the suicide attempt in Drope served to remove Drope from the courtroom during his trial. "[A]s a result of [Drope's] absence the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him." 420 U.S. at 181, 95 S.Ct. at 908. This was plainly not the case at Speedy's trial. Speedy was present throughout; there was nothing in his behavior to indicate to the judge that he might have been incompetent. Habeas Transcript at 56.
 
 
 21
 Yet another distinguishing factor is that the crimes charged in Robinson and Drope were of such a bizzare nature as to put the trial judge on notice that the defendant's mental condition required careful scrutiny. Robinson was charged with the shooting death of his wife; the death was a senseless, irrational act without any apparent motive. Drope and a number of his acquaintances were charged with the gang rape of Drope's wife. There was nothing about Speedy's offense, on the other hand, to indicate that it was other than a crime of passion. Speedy had several times tried to renew his relationship with his ex-wife, but she had refused to stop seeing her new boyfriend. Speedy then went to the home of his ex-wife's boyfriend and shot him and one of his guests.
 
 
 22
 Finally, the instant case is unlike Robinson and Drope in another significant way. Although in both Robinson and Drope no formal motion for a competency hearing was made, the issue of competence nevertheless was raised in a very clear way by defense counsel in both cases. A doubt expressed by a lawyer in open court concerning the competence of his client to stand trial is unquestionably a factor to be considered in determining whether to hold a competency hearing. 420 U.S. at 177 n. 13, 95 S.Ct. at 906-07 n. 13.
 
 
 23
 During Robinson's trial, his attorney solicited opinions from the witnesses as to Robinson's present lack of sanity. Drope's counsel specifically asked for a continuance prior to trial to procure an additional psychiatric examination which " 'could be done during the summer months and [defendant could] be ready for trial or else the examination would eliminate trial by September.' " Id. at 177 n. 12, 95 S.Ct. at 906 n. 12 (quoting trial transcript). When the court denied the continuance, Drope's counsel objected " 'for the reason that the defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial.' " Id. at 165, 95 S.Ct. at 900-01 (quoting trial transcript).
 
 
 24
 While the failure of an attorney to request a competency hearing can in no way be taken as a waiver of the right not to be convicted while incompetent, see Pate v. Robinson, 383 U.S. at 384, 86 S.Ct. at 841, the fact that attorneys for both Robinson and Drope raised the issue of the competence of their clients was a warning signal which, when combined with the other indicia of incompetence revealed by the evidence in those cases, should have caused the trial court to order a competency hearing.[4] We have carefully reviewed the transcript in this case and find that no similar warning signal was ever given to the trial court by Speedy's attorney.
 
 IV.
 
 25
 For the reasons already stated, we do not believe the evidence before the trial court suggesting incompetence to stand trial to have been sufficient to raise a reasonable doubt as to Speedy's competency. We therefore affirm the dismissal by the District Court of Speedy's petition for a writ of habeas corpus.
 
 
 
 [1]
 The Honorable Clyde S. Cahill, Jr., United States District Judge for the Eastern District of Missouri
 
 
 [2]
 The court-appointed psychiatrist expressed no opinion on Speedy's competence
 
 
 [3]
 Neither psychiatrist was apparently aware of the full extent of Speedy's irrational acts when he expressed the written opinion that Speedy was competent to stand trial. During cross-examination, Speedy's attorney disclosed to the prosecution psychiatrist two instances of Speedy's violent and irrational behavior of which the psychiatrist was previously unaware. The disclosures did not cause him to change his diagnosis of Speedy in any way. Transcript at 310-16. Speedy's attorney disclosed the same two incidents to the defense psychiatrist at trial. He also did not change his diagnosis. Id. at 261-63
 
 
 [4]
 Query whether the evidence of incompetency presented in Robinson or Drope would have been substantial evidence raising a reasonable doubt as to competency without the additional doubt raised by defense counsels' assertions questioning the competency of their clients. Compare Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956) (per curiam), vacating 223 F.2d 582 (D.C.Cir.1955)