Frank W. WHITEHEAD, Petitioner,

v.

Louie L. WAINWRIGHT, Secretary, Department of Offender Rehabilitation, State of Florida, Respondent.

No. 75–369 Civ. T–K.

United States District Court, M. D. Florida, Tampa Division.

March 21, 1978.

Because of the improper admission into evidence of prior criminal involvement, that conviction was overturned on June 8, 1973. *Whitehead v. State,* 279 So.2d 99 (2d D.C.A. Fla.1973). Petitioner was tried again November 28–29, 1973, and convicted and sentenced on the latter date to twenty years imprisonment. The conviction was affirmed on appeal on March 19, 1975. *Whitehead v. State,* 309 So.2d 584 (2d D.C. A.Fla.1975). The habeas corpus petition herein followed.

The United States Magistrate, who considered the case pursuant to general order of assignment, recommended that an evidentiary hearing be held on petitioner's incompetence claim, and that the speedy trial and self-representation claims be dismissed. On September 15, 1977, this Court dismissed the speedy trial and self-representation claims. The remaining issue, the competency of petitioner to stand trial, was the subject of three hearings and is the remaining issue for consideration herein.

B. Garnett Page, Temple Terrace, Fla., for petitioner.

Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, Fla., for respondent.

## OPINION AND ORDER

KRENTZMAN, District Judge.

The Court has for consideration a habeas corpus proceeding pursuant to 28 U.S.C. § 2254. Petitioner is a state prisoner who seeks release from prison because of the alleged violation of his right to due process. More specifically, he alleges that, because of the administration of prescribed medication, he was incompetent during a portion of his trial.

Petitioner was charged by information with second degree murder on January 15, 1972. He was convicted on April 26 and sentenced on May 12 of that same year.

## FINDINGS OF FACT

The following chronology will reveal the relationship between the administration of medication to the petitioner and the events at his trial. Prior to the trial, petitioner had complained of allergies and had been taking Benadryl, an antihistamine, in 50 milligram quantities four times a day. He had also been taking Valium, a tranquilizer, in 5 milligram quantities four times a day; this medication had been prescribed for petitioner after he had complained of nervousness and tension. He had been taking both these medications for some time prior to the beginning of the second trial.[1] Petitioner testified that on the evening of the first day of trial, November 28, and on the morning of the second day of trial, November 29, 1973, he did not receive his usual prescribed medication when medications were distributed at the Polk County Jail. At the trial that morning, he felt nervous. The trial

---

1. See Dr. Bills' testimony, "Pertinent Portions of State Trial Proceedings November 28–29, 1973," 224–230.

court was informed of the lack of medication, according to petitioner, and granted a recess to enable petitioner to be examined and treated for his nervousness. Petitioner was taken to the Polk County Hospital at some time after 10:15 that morning, when the recess commenced. He was examined and found to be anxious, nervous, tense, and depressed. He was then given Valium and Benadryl, respectively a tranquilizer and antihistamine, according to Dr. Bills' testimony in the trial court.[2] At the evidentiary hearing held by this Court, petitioner testified that at the hospital he was given three prescriptions which were filled there, and then the petitioner took the three medications.

The record clearly shows that two of the medications were Valium and Benadryl. The identity of the third medication is unclear; Dr. Bills referred to an antidepressant, which he did not identify, that was added to petitioner's medication on the morning in question.[3] Petitioner testified that he remembered the third medication as having written on it the term "Roche 66." "Roche 66" was identified as a tranquilizer or sedative by Dr. Clifford Lober, a physician who testified in this Court about the effects of all three drugs. The Court finds that petitioner took three pills at the hospital in the mid-morning: one Valium (5 mg); one Benadryl (50 mg); and one Roche 66.

After returning from the Polk County Hospital to the Polk County Jail, petitioner testified, he received his medication with the normal midday distribution. At that time he received Valium, Benadryl, and Roche 66, according to his testimony. While the medication distribution records of the Polk County Jail are no longer available, it is plausible that Mr. Whitehead received a second distribution of medication at noon. Dr. Bills pointed out in the hearing held by the trial court, ". . . we prescribe medication, but sometime when the individual is in jail we are not sure of what he was given. I mean, I do not know

exactly how much he was given."[4] The Court finds that petitioner received a second dose of each of the three medications, Valium, Benadryl, and Roche 66, about midday at the Polk County Jail.

After the recess, at approximately 1:30 p. m., the Court reconvened to hold a hearing on petitioner's condition. The Court inquired of Dr. Bills, who had treated petitioner previously and examined petitioner earlier that day, and was aware of his general condition.[5] Dr. Bills, however, did not inform the court and was probably unaware that petitioner had received a second dose of the prescribed medication at midday. The trial court, without specifically finding petitioner competent at that point, apparently satisfied itself of petitioner's competency to stand trial after this interchange with Dr. Bills:

Q. Do you think at this time he is competent and knows what he is doing?

A. As far as being competent, I think that he is competent, yes sir.

Q. Is he in shape and in mental capacity to cooperate with his counsel and advise him as to things that will happen and not happen?

A. I think I would have to say that he is competent to do these things at this time, but I think he is feeling a great deal of pressure and he is afraid that he might not be able to control his own behavior. I would have to qualify it in this manner. I mean, as far as being able to, you know, talk to someone rationally, coherently and logically, yes.

Q. Do you feel he is in touch with reality?

A. Yes sir, I do.

Q. Do you think he is capable of reaching objective decisions?

A. The only reason he wouldn't be able to is he may be feeling some effects of the medication in terms of sleepiness, and only in that sense, but in any other

---

**2.** *Id.* at 227.

**3.** *Id.* at 226.

**4.** *Id.* at 229.

**5.** *Id.* at 224–25.

sense of your question, yes, I would say so.[6]

After that colloquy and some questions from petitioner's counsel, Mr. Flood, the trial court announced its intention to continue the trial that afternoon. Thereupon, petitioner asked to be excused from the courtroom; the court refused his request.[7] The petitioner then renewed his request, and repeated it after the trial court indicated it could not hear him; at this time petitioner indicated that he was sleepy and wanted to "go to bed."[8] The trial court again denied his request, asking petitioner to inform his attorney if he felt he was going to lose control of himself or fall asleep, and concluded, "I have no reason to think that you are going to be any different tomorrow or next week or next year, and we'd better go ahead."[9]

The trial of the case continued at that time. Petitioner asked to be allowed to leave the courtroom several more times during the remainder of the trial. Prior to the commencement of closing arguments the court granted petitioner's request to be excused.[10]

Petitioner's general condition and demeanor during the afternoon of the second day of trial is a matter over which there is some difference of opinion in the evidence before the Court. Mr. Flood, petitioner's attorney at the trial, testified that on the first day of trial and the morning of the second day, petitioner was generally agitated. On the first day, he attempted to discharge Mr. Flood several times, and attempted to take part in the cross-examination of witnesses. On the morning of the second day, while he did neither of those, he did complain to Mr. Flood about the course of events. Mr. Flood could not recall the nature or extent of his communication with petitioner in the afternoon, but did state that he thought it had been as much as was necessary. While he thought petitioner was aware of what was happening in the courtroom, he remembered petitioner having laid his head on the table in front of him at times during the afternoon, and toward the end of the trial having his head in his arms until the defense rested.

Petitioner offered two witnesses besides himself on the issue. One was his sister, Karolyn Raulerson, and one was his ex-wife, Margaret Tyer. Both testified that on the first day of trial and during the morning of the second day, he appeared to be normal to them, although nervous. On the afternoon of the second day, he seemed drunk, sleepy, staggering, and glassy-eyed. He put his head on the table several times, and his counsel would "punch" him to awaken him. Ms. Tyer testified that when he spoke he would speak loudly at times and mumble at other times. Both testified that his speaking was slurred.

Petitioner testified that he calmed down after taking the pills, but an hour later broke out into a cold sweat and became lightheaded and very sleepy. He remembered having been found guilty, but did not recall having made statements attributed to him in the transcript. He recalled having fallen asleep at the defense table.

The Court finds that petitioner has presented substantial facts to support his allegation that he was unable to consult rationally with his lawyer and did not have a rational as well as factual understanding of the proceedings against him. The Court further finds that, as far as can be determined from the available evidence,[11] petitioner was unable to consult with his lawyer and did not have a rational or factual understanding of the proceedings against him, during the afternoon of November 29, 1973.

**6.** *Id.* at 228.

**7.** *Id.* at 233.

**8.** *Id.*

**9.** *Id.* at 234.

**10.** *Id.* at 291.

**11.** The Court was informed by petitioner's counsel that Dr. Bills was recently hospitalized for a serious illness and was likely to be unavailable for testimony for some time.

## CONCLUSIONS OF LAW

The requirement that an accused be mentally competent to stand trial is a long-held tenet of common law, arising out of the common law's abhorrence of trials in absentia. *See generally* Note, Florida's Incompetency to Stand Trial Rule: Justice in a Straightjacket, 17 U.Fla.L.Rev. 248, 249–250 (1974). The requirement was recognized implicitly by the Supreme Court in *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956), vacating 96 U.S.App.D.C. 117, 223 F.2d 582 (1955). *See id.* at 123 & ff., 223 F.2d at 588 & ff. (Bazelon, C. J. dissenting). The principle was succinctly stated in *Pate v. Robinson*:

".  .  . the conviction of an accused person while he is legally incompetent violates due process, . . . and . . state procedures must be adequate to protect this right." *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966).

The standard for incompetency, different from that employed to determine insanity, is as follows:

whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824; *Nathaniel v. Estelle*, 493 F.2d 794, 796 (5th Cir. 1974).

Where a petitioner alleges his incompetency at the time of trial, the duties of the federal court hearing the matter are clear:

.  .  . when a prisoner, either state or federal, seeking post-conviction relief, asserts, with substantial facts to back up his allegation, that at the time of trial he was not mentally competent to stand trial, and that there was no resolution of that precise issue before he was tried, convicted and sentenced, the . . . Fourteenth Amendment . . . requires that such conviction and sentence be set aside unless upon adequate hearing it is shown that he was mentally competent to stand trial.

.  .  .  .  .  .

. . . it will be the duty of the trial court . . . to decide whether it can conduct an adequate hearing on the question of [the prisoner's] competency to stand trial . . . . . If it cannot, it will be under the obligation to set aside the judgment of conviction and remand the case to the state courts for a new trial . . . . . *Lee v. Alabama*, 386 F.2d 97, 105, 108 (5th Cir. 1967) (en banc). Accord, *Bruce v. Estelle*, 483 F.2d 1031, 1037–38 (5th Cir. 1973).

There is no question that petitioner has presented the Court substantial facts to support his allegation that he was not mentally competent on the afternoon of the second day of trial. Nor does the Court have any doubt that there was no "precise resolution" of the incompetency issue raised by petitioner here: incompetency due to repeated doses of medication.

Having so concluded, the Court is then required to decide whether it can conduct an "adequate hearing" on the petitioner's competency to stand trial. The Court has held several hearings directed to this issue, and it has found, *supra*, that this Court is able to determine that petitioner was unable to consult with his lawyer with a reasonable degree of rational understanding and did not have a rational or factual understanding of the proceedings against him on the afternoon of the second day of trial. Having so found, the Court concludes that petitioner was incompetent to stand trial during that time. Accordingly, the petitioner must be afforded a new trial. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956).

It is thereupon

ORDERED and ADJUDGED:

1. That the judgment and sentence entered by the trial court, together with the commitment in said case, be and the same are hereby voided.

2. That the State of Florida shall release petitioner on said charge unless he is

brought to trial thereon within sixty (60) days from this date.

3. In the event petitioner is convicted after a new trial, his sentence shall not exceed the sentence imposed at his original trial and he shall be given credit for the period of his prior incarceration.

4. The Clerk is directed to enter judgment and award costs accordingly.

DONE and ORDERED at Tampa, Florida this 21 day of March, 1978.