CARNES, Circuit Judge,
dissenting:
The issue in this case is whether the Constitution permits the trial and conviction of a defendant whose condition is such that he is not aware of what is going on during seventy percent of his five-day trial. The majority thinks so. I think not.
I.
Before discussing my disagreement with the majority about the issues that are presented in this appeal, it might be helpful to discuss why we all agree that one issue is not presented. An explanation is in order because that issue seems so clearly raised by the facts of this case. It is, but the State of Florida chose not to argue the issue to us. The issue I am speaking of involves the self-induced nature of Carl Watts’ condition during his trial.
Watts did not know what was going on during most of his murder trial and, according to his trial counsel, was not able to assist counsel during that time, because Watts stayed up all night every night of the trial obtaining and smoking crack cocaine. At the time, Watts was a twenty-three year old crack addict, having been hooked on cocaine for seven years. He had shot his best friend to death with a shotgun — after having prepared a sandwich for him a few hours earlier — as a result of an argument over ten dollars worth of a twenty dollar' bill. Watts admitted the shooting but claimed self defense. He was out on bond during the trial, and he was scared, depressed and anxious about what he had done, and about his prospects. So, Watts did what crack addicts do: *1291 he spent all the time he could scrounging around for and smoking crack.
And Watts lied about it. Crack addicts do that a lot, too. Astonished by Watts’ bizarre behavior of sleeping though the trial, the judge periodically asked him point blank if he had been taking drugs, and Watts point blank told him no. The judge suspected Watts was lying, but let it go. He did not order Watts examined, and he did not revoke his bond, which would have (hopefully) cut off his access to crack.
Nonetheless, no one held a gun to Watts’ head and forced him to run around smoking crack each night of the trial. And no one forced him to lie repeatedly to the judge about his condition. Thus the facts frame the issue of whether self-induced incompeteney is to be treated differently or, to put it another way, whether one whose own actions throughout the trial caused his incompetency has waived his right not to be tried while incompetent. Arguments can be made both ways, and it is an interesting issue. But it is not one that has been presented to us.
On direct appeal, the State of Florida argued that because Watts had intentionally induced his condition at trial, he was barred from complaining about being tried while in that condition. The Florida appellate court rejected that contention, holding that the Florida Supreme Court had previously foreclosed it. Watts v. State, 537 So.2d 699, 700 (Fla. 4th DCA 1989) (citing Lane v. State, 388 So.2d 1022, 1026 (Fla.1980) (“Intentional action by a defendant does not avoid or eliminate the necessity of applying the test of whether a defendant has the sufficient present ability to assist counsel with his defense and to understand the proceedings against him.”)).
The Florida appellate court ruled in the State’s favor in this case anyway, affirming Watts’ conviction. The federal district court did not, however, and the State could have chosen to argue the self-inducement, or waiver, position to us. After all, we are no more bound by the Florida courts’ holdings on such an issue than those courts would be bound by an earlier holding of this Court on some federal constitutional issue. Nonetheless, the State chose not to argue self-inducement or waiver to this Court. It is not mentioned in the State’s initial brief or in its reply brief, and the attorney representing the State tenaciously resisted our efforts to explore the issue at oral argument. For that reason, the majority does not address the issue, and I cannot say that the majority is wrong for failing to do so. See, e.g., Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir.1995) (“We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.” (quotation marks and citation omitted)); Marek v. Singletary, 62 F.3d 1295, 1298 n. 2 (11th Cir.1995) (“Issues not clearly raised in the briefs are considered abandoned.”), petition for cert. filed, (U.S. March 22, 1996) (No. 95-9105); 16 Wright, et al., Federal Practice and Procedure § 3974, at 421 n. 1 (1977) (“An issue not raised or argued in the brief of the appellant may be considered waived and thus will not be noticed or entertained by the court of appeals.”). Whether a defendant who induces his own incompetency can successfully assert it as a bar to trial is an issue for another day. I turn now to the issue that is presented to us, the issue for this day.
II.
“It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.” Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). A defendant is not mentally competent to stand trial unless he has “a rational as well as factual understanding of the proceedings against him.” Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (quotation marks omitted). The majority does not quarrel with the statement of these fundamental precepts, and it acknowledges that Watts was asleep during seventy percent of his trial. Nonetheless, the majority concludes that it was constitutionally permissible to try him in that condition.
*1292 In reaching its holding that Watts, although asleep during most of his murder trial, was nevertheless mentally competent to be tried, the majority discounts the constitutional importance of a defendant’s ability to understand the proceedings against him, and to aid in his defense. It minimizes a defendant’s role in his defense by characterizing it as one of “limited responsibilities,” involving “few trial-related decisions reserved for defendants (i.e., whether to plead guilty, whether to request a jury trial, whether to be present at trial, and whether to testify).” See Majority op. at 2675-76. The majority then reasons that, because “[t]he defendant need not participate in the bulk of trial decisions, which may be left entirely to counsel,” a defendant capable of making those few strategic decisions that only a defendant can make is capable of “providing the level of input necessary to mount an adequate defense,” and therefore is competent to stand trial. See Majority op. at 2676. Under the majority’s view, once a defendant has made those few strategy decisions, his presence at trial, or at least his awareness of what is happening during trial, is of no constitutional significance. I disagree.
The requirement that a defendant be mentally competent to stand trial is a long-held tenet of common law. See, e.g., Medina v. California, 505 U.S. 437, 444, 112 S.Ct. 2572, 2577, 120 L.Ed.2d 353 (1992) (“The rule that a criminal defendant who is incompetent should not be required to stand trial has deep roots in our common-law heritage.”); Drope, 420 U.S. at 171, 95 S.Ct. at 903; Youtsey v. United States, 97 F. 937, 940 (6th Cir.1899) (recognizing mental competency requirement and that, “[t]o the same effect are all the common-law authorities”). “The competency rule did not evolve from philosophical notions of punishability, but rather had deep roots in the common law as a byproduct of the ban against trials in absentia; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself.” Stone v. United States, 358 F.2d 503, 507 n. 5 (9th Cir.1966) (quotation marks and citation omitted). The rule against trying the mentally incompetent does embrace concerns that a defendant be able to make major decisions that may determine his fate. As Blackstone wrote, one who becomes “mad” after the commission of an offense should not be arraigned for it “because he is not able to plead to it with that advice and caution that he ought.” 4 William Blackstone, Commentaries *24. But the rule extends beyond pleading concerns. Blackstone also wrote that if a defendant becomes mad after pleading, he should not be tried, “for how can he make his defence?” Id.; see also 1 M. Hale, Pleas of the Crown *34-*35 (same). The prohibition against trying a defendant whose condition renders him unable to participate in his defense is an important safeguard “fundamental to an adversary system of justice,” which is incorporated into the Due Process Clause. Drope, 420 U.S. at 172, 95 S.Ct. at 904; see also Cooper v. Oklahoma, — U.S. -, -, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996) (“We have repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process.” (quotation marks and citation omitted)); Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966) (“[T]he conviction of an accused person while he is legally incompetent violates due process.... ”).
Faced with the long and distinguished pedigree of the right not to be tried while incompetent, the majority struggles to diminish the importance of that right, and its struggle produces a remarkable conclusion. Citing a law review article, whose title suggests a cost-benefit analysis, the majority engages in a “[mjodern analysis” using “contemporary understanding” and reaches the conclusion that “the common law basis for expansive competency rights is largely outdated.” Majority op. at 1288 n. 9. The competency rights recognized in courts of Blackstone’s day are too liberal for us, it seems. But see Cooper, — U.S. at -, 116 S.Ct. at 1376 (“No one questions the existence of the fundamental right that petitioner invokes____ Nor is the significance of this right open to question.”)[1]
*1293 We sometimes speak of “the evolving standards of decency that mark the progress of a maturing society,” but I always thought it understood that the evolution was supposed to be forward. This is the first time I have heard it suggested that our standards have progressed in such a way that contemporary understanding would deny an American citizen the full benefit of an important trial right guaranteed Englishmen at least as early as the seventeenth century. Some understanding. Some progress.
The majority’s opinion today reduces the important safeguard against being tried while incompetent to one that merely requires that a defendant be able to make a few strategic decisions, and it is apparently enough for the majority if those decisions are made before the trial even begins. But see Cooper, — U.S. at ---, 116 S.Ct. at 1381-82 (“After making the profound choice whether to plead guilty, the defendant who proceeds to trial ... also is called upon to make myriad smaller decisions concerning the course of his defense. The importance of these rights and decisions demonstrates that an erroneous determination of competence threatens a fundamental component of our criminal justice system — the basic fairness of the trial itself.” (quotation marks and citations omitted)). Apparently, under the majority’s view, the necessary decisions can be made at any time, and once they are made, any claim of incompetency is foreclosed. Thus the majority’s position quickly reduces to the absurd. It would, for example, justify the trial and conviction of a defendant who had been rendered comatose on the eve of trial, provided only that he had communicated his views on the necessary strategic decisions to his counsel beforehand.
The majority does not justify its crabbed reading of the competency requirement, a reading which affords no protection to a defendant such as Watts who was unable to contribute anything at all to his defense during the majority of the trial. The Supreme Court has instructed us that “it is not enough ... that the defendant [is] oriented to time and place and [has] some recollection of events.” Dusky, 362 U.S. at 402, 80 S.Ct. at 788-89 (alteration in original) (quotation marks omitted). Instead, the critical inquiry is into “whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.” Id. at 402, 80 S.Ct. at 789 (emphasis added) (quotation marks omitted). Watts was neither oriented in time and place, nor able to consult with his lawyer during seventy percent of his five-day murder trial. He could not have had a factual understanding of the proceedings against him during that time, because he was not cognizant of those proceedings or of anything else, save perhaps for what he may have been dreaming. Because of his condition, Watts was unable to contribute sufficiently to his defense.
Contrary to what one might infer from reading the majority opinion, Watts’ attorney could not communicate with him whenever he thought it necessary, and the judge did not verify that counsel could. Although the record shows that counsel could sometimes awaken Watts, it also shows that on more than one occasion during the trial, counsel was unable to wake him up, and the court noted that fact for the record. At one point, defense counsel said to Watts: “[Y]ou didn’t even notice that I attempted to wake you up,” and the judge observed, “On one occa *1294 sion I saw you hit him in the shoulder and he never even moved. He never budged.” (Trial Tr. at 337-38). As the majority concedes, “Watts could not be awakened to stand as the jury retired to deliberate.” Majority op. at 2671.
Nor is it accurate to infer, as one might from the majority opinion, that when counsel stated in exasperation, “I’m doing the best I can to represent Mr. Watts under the circumstances he’s putting me in,” Majority op. at 2671, that counsel was simply, or primarily, concerned that the jury might be prejudiced by seeing Watts sleep through his trial. At sentencing, which occurred just eight days after the trial, defense counsel made the following representation to the judge:
I went through a trial where my client was literally unable to help me, whatever. I was unable to even talk to him because I couldn’t wake him up. That was the reason why.
(Trial Tr. at 567-68). The trial judge did not express any doubt about the accuracy of counsel’s statement, nor did the state appellate court. After considering the record as a whole, and crediting defense counsel’s statement, the district court concluded that “there were lengthy periods during critical stages of his murder trial that [Watts] was unable to assist his attorney.” (Report of Magistrate Judge at 19).[2] That is a factfinding of the district court, and it is certainly not clearly erroneous.
The prosecution presented thirteen witnesses against Watts, many of whom described the scene where the killing occurred, or his actions near the time of it. However, there were no eyewitnesses to the actual killing, other than Watts, who did not testify. The evidence presented a close issue about self defense — the man Watts shot was much larger than he, had a violent nature, and was advancing on him inside Watts’ own apartment when the shooting occurred. Because of the closeness of that issue, and the nature of the testimony, Watts’ ability to assist his counsel with the facts as the testimony unfolded was critical. Yet Watts was unable to assist his lawyer in formulating cross-examination, because he did not hear most of the testimony.
Watts may have been able to contribute generally to his lawyer’s cross-examination strategy hours or days in advance of it. In the same way, he was able to make certain strategic decisions in advance — such as his decision not to testify, which he communicated to his lawyer more than a week before the trial began. However, Watts was not presently able to assist his lawyer during the majority of his trial. Nor was he presently able to reconsider any of his strategic decisions, such as his decision not to take the stand, in light of the testimony against him; he was not able to do that, because he did not hear most of the testimony against him.
The majority’s holding in this case is contrary to this Court’s decision in Whitehead v. Wainwright, 609 F.2d 223 (5th Cir.1980). In that case, Whitehead, the defendant, had taken Benadryl for his allergies, and also the tranquilizers Valium and “Roche 66.” With the court’s permission, those tranquilizers had been prescribed by a doctor who examined Whitehead and treated him for a nervous condition during the trial. As a result of taking that medication, Whitehead became extremely drowsy during one afternoon of his two-day trial. Whitehead v. Wainwright, 447 F.Supp. 898, 900-01 (M.D.Fla.1978). Whitehead’s lawyer later testified he could not recall the nature or extent of his communication with his client during the afternoon of the second day of trial, but he thought it had been as much as was necessary. He did remember that Whitehead had his head on the table in front of him at times during the afternoon, and that, toward the end of the trial, he had rested his head in his arms much of the time. Id. at 901. Two family members testified that Whitehead had “seemed drunk, sleepy, staggering, and glassy-eyed.” His lawyer would “punch” him to awaken him. Id. Whitehead himself later testified that he had fallen asleep at the defense table. Id.
*1295 As a result of that testimony, the district court in Whitehead held that the defendant, because he had been groggy or asleep during one-fourth of his trial, had been unable to consult sufficiently with his lawyer, had lacked a sufficient rational or factual understanding of the proceedings against him, and therefore had been incompetent to stand tidal. The district court granted habeas relief. Id. at 902-03. On appeal, we affirmed the district court’s holding that the defendant had been incompetent on the afternoon of the second day of his trial, and affirmed its grant of relief. We concluded by saying:
While we are convinced that the state trial judge did all he could to assure petitioner a fair trial, short of dismissing the jury and starting anew at a later date, the district court’s finding of incompetence is supported by the record and must be left undisturbed.
Whitehead, 609 F.2d at 224.
The majority attempts to deal with the binding precedent of the Whitehead decision in two ways, neither of which is convincing. First, the majority suggests that Whitehead, the defendant in that case, had been in materially worse shape than Watts was in this case, because, the majority says, Whitehead was “unable to comprehend the proceedings or communicate with his attorney even when he was awake.” Majority op. at 2677. That would be news to Whitehead’s attorney and to the courts that decided the case. Whitehead’s lawyer testified that, in his opinion, Whitehead had been aware of what was happening in the courtroom, and that he thought he had been able to communicate with Whitehead as much as was necessary during the afternoon in which his condition was in question. 447 F.Supp. at 901. Nonetheless, the district court held that Whitehead had been incompetent to stand trial, and we affirmed.
The second way the majority attempts to deal with the binding precedent of the Whitehead decision is by suggesting that there can be no binding precedent in this area of the law. That is so, the majority implies, because “the inconsistency among competency cases makes analogizing to a single case somewhat arbitrary.” Majority op. at 2677 n. 13. This proposition, if true, bodes ill for the rule of law. Surely our circuit law is not so confused and inconsistent that decision by analogy, i.e., by rule of law, has been reduced to a “somewhat arbitrary” process that justifies throwing up our hands and simply picking a result that seems to comport with our feelings at the time. If the majority is correct that our precedents are so inconsistent that following them is “somewhat arbitrary,” then the situation cries out for en banc review, and this case can be a vehicle for it.
Even if our decisions in this area of the law are as inconsistent as the majority believes, however, there is no inconsistency as it relates to the specific issue in this case. At least not until today. Before today, neither this Court, nor any other court that I am aware of, had ever held that a defendant who is not aware of what is going on during most of his trial is competent to stand trial. Our holding in Whitehead was that a defendant who is groggy, sleepy, and asleep during one afternoon of his two-day trial is incompetent to stand trial. That holding cannot be reconciled with the majority’s holding in this case that someone who is asleep during most of his trial is not incompetent. A defendant who is not consciously aware of what is happening during seventy percent of his trial, whether because he is in a drug-induced stupor or simply asleep, cannot rationally and factually understand the proceedings during that time, nor can he react to any testimony or other evidence and communicate with his lawyer about it.
In Ferrell v. Estelle, 568 F.2d 1128 (5th Cir.), withdrawn, 573 F.2d 867 (5th Cir.1978),[3] we affirmed the district court’s grant of habeas relief to a petitioner who became deaf between the time of the murder with which he was charged and the time of his trial. In the brief period from the onset of his deafness to his trial, Ferrell did not learn to read lips or to understand sign language. His counsel asked the court to provide ste *1296 nographers who could contemporaneously transcribe the words spoken during the trial. The judge denied the request. We affirmed the grant of habeas relief. Although Ferrell was able to communicate with his lawyer from time to time (by exchanging notes), and was therefore able to make important strategic decisions regarding his defense, he was not able to understand contemporaneously the testimony against him.[4] In this case, Watts’ inability “to consult with his lawyer with a reasonable degree of rational understanding,” and obvious lack of “a rational as well as factual understanding of the proceedings,” Dusky, 362 U.S. at 402, 80 S.Ct. at 789, was at least as profound as Ferrell’s.
Although supported by the binding precedent of the Whitehead decision and by the withdrawn opinion in Ferrell, my position is not dependent upon either of them. Instead, it rests on this simple logic: A defendant who is contemporaneously unaware of what is going on during most of his trial does not have a rational as well as factual understanding of what is occurring, as it is occurring, and lacks the present ability to consult with his attorney during the trial and in response to its events. Therefore, the trial and conviction of a defendant who suffers from such a condition is unconstitutional. I would affirm the district court decision granting Watts relief for the violation of his substantive due process right not to be tried while mentally incompetent.
III.
Because I conclude that Watts was tried while incompetent, which violates his substantive due process rights, it is unnecessary for me to decide whether a violation of his procedural due process rights also occurred because the trial judge did not conduct a hearing into Watts’ competency to stand trial.
However, I do note that the judge knew that Watts was a drug addict, knew he was out on bond, knew he was behaving strangely during trial, was told by defense counsel at the time that he was “pretty sure” Watts was using drugs (Trial Tr. at 564, 566), and the judge did not believe Watts’ denials. As the judge stated on the record at sentencing, “everybody that was a witness to Carl’s conduct had some suspicions that he was probably taking some kind of drugs.” (Trial Tr. at 567). Suffice it to say, in view of all of the circumstances, it seems to me that the judge not only should have had, but actually did have “a bona fide doubt” as to Watts’ competency to stand trial.
IV.
I dissent from the Court’s reversal of the district court’s grant of habeas relief. We should affirm.

. The majority opinion quotes Holmes for the proposition that, "It is revolting to have no better *1293 reason for a rule of law than that so it was laid down in the time of Henry IV.” Majority op. at 1288 n. 9 (quoting Oliver Wendell Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897)). That is a nice quote. But Holmes, as he said, had in mind such things as "the technical rule as to trespass ab initio, as it is called which I attempted to explain in a recent Massachusetts case.” Holmes, supra, at 469 (footnote containing citation omitted). He was not thinking of or speaking about any of an accused’s criminal trial rights, and certainly not about a criminal trial right so "fundamental to an adversary system of justice,” Drope, 420 U.S. at 172, 95 S.Ct. at 904, as to be incorporated into the Due Process Clause, Cooper,-U.S. at-, 116 S.Ct. at 1376. Nor did Holmes disparage the use of history as part of the process of determining the law. Indeed, in the same article he said, "The rational study of law is still to a large extent the study of history.” Holmes, supra, at 469.

. The magistrate judge's report and recommendation was adopted and approved in its entirety by the district court.

. Our decision in Ferrell was withdrawn upon discovery that the petitioner had died three months before the decision was released. Because it was withdrawn, the Ferrell decision is not binding precedent, but I discuss it here because the reasoning is persuasive and the facts pose such a thought-provoking hypothetical.

. The Court in Feirell did not reach the issue of whether Ferrell’s incompetency deprived him of substantive, as distinguished from procedural, due process. The Court conceived of other alternatives, besides stenographers (who would have slowed down the trial), that would have given Ferrell the ability to contemporaneously understand the proceedings. The Court concluded that "Ferrell’s rights were reduced below the constitutional minimum,” because the district court failed to explore such other possibilities. Id. at 1133.