United States Court of Appeals,

Eleventh Circuit.

No. 95-4403.

Carl Eugene WATTS, Petitioner-Appellee,

v.

Harry K. SINGLETARY, Respondent-Appellant.

July 18, 1996.

Appeal from the United States District Court for the Southern District of Florida. (No. 94-6258-CIV-UUB), Ursula Ungaro-Benages, Judge.

Before KRAVITCH, DUBINA and CARNES, Circuit Judges.

KRAVITCH, Circuit Judge:

A habeas petitioner contends that his due process rights were infringed when he was tried and convicted in state court for murder while incompetent to stand trial. We hold that petitioner has failed to prove a violation of his procedural due process right to a competency hearing or his substantive due process right not to be tried while incompetent.

I.

In 1987, Carl Eugene Watts was tried in Florida state court and convicted by a jury of second-degree murder. Watts was asleep through much of the five day trial.

On the first day of trial, the judge recorded his initial observation of Watts's behavior: "I'd also like to make a statement for the record at this time that during the entire voir dire examination that I've conducted, since about 3:30 and it's 20 minutes to 5:00, that the defendant in this case, Mr. Watts, has been sleeping at counsel table." Trial tr. at 69.

The next day, after two prospective jurors approached the judge to express concern that Watts's sleeping would threaten their ability to remain impartial,[1] the judge questioned Watts about the cause of his continuing somnolence:

> THE COURT:  First thing I'd like to put on the record is that Mr. Watts for the second day in a row has slept through 90 percent of the ... questioning this morning and Mr. Blostein [counsel for Watts] has on occasion had to wake him up.  I'm sure the jurors have all seen this.  I'd like to ask some questions at this time.
>
> Mr. Watts, are you under the influence of any drugs or alcohol or medication today?
>
> WATTS:  No, sir.
>
> THE COURT:  Is there any particular reason why you are sleeping through this serious trial which is probably going to effect your life?
>
> WATTS:  No, sir.  I'm not sleeping through it.
>
> ....
>
> THE COURT:  You have your eyes closed.  You have your head down on your neck or your chest and it seems pretty obvious to everybody in the courtroom that you are sleeping.

Trial tr. at 130-31.

As Watts continued to sleep, the judge initiated a similar colloquy with Watts and his lawyer at least once on each subsequent day of the trial.  After estimating the percentage of the recent proceedings through which Watts had slept, the trial judge would ask Watts if he was under the influence of any drugs;  Watts always replied that he was not.  When pressed for an explanation of his inability to stay awake, Watts on one occasion suggested that he was not sleeping, but praying—a characterization that both the judge and Watts's attorney strongly doubted.  On other occasions,

---

[1]Neither of these two jurors was ultimately impanelled.

Watts professed to having no explanation for his sleeping, disavowing physical illness, in addition to the use of alcohol, medication, or drugs. In response to a question from the bench, Watts indicated that he had never been treated for mental illness.

Watts's attorney at one point expressed frustration at his inability to keep his client awake:

> MR. BLOSTEIN: For the record, and for my own protection on this, my thought is that Mr. Watts is also sleeping. I have over the last three days had to wake him up on numerous occasions including today and [addressed to Watts] if you were praying you didn't even notice that I attempted to wake you up.

> THE COURT: On one occasion I saw you hit him in the shoulder and he never even moved. He never budged.

> MR. BLOSTEIN: Exactly. I'm doing the best I can to represent Mr. Watts under the circumstances he's putting me in.

Trial tr. at 337-38. Nevertheless, Watts's attorney never raised the issue of Watts's competency at trial or requested a competency hearing.

Prior to closing arguments, the judge questioned Watts in an attempt to ensure that he understood his decision not to testify on his own behalf:

> THE COURT: You are doing all right. Okay. You remember last week when your attorney put a couple witnesses on for you; do you remember that?

> WATTS: Yes, sir.

> THE COURT: I think your mother came in and testified and your sister?

> WATTS: Yes, sir.

> THE COURT: I want you to understand that you have a right to testify in this case if you want. Now your lawyer indicated to us last week that you were not going to testify and I just wanted to double check with you and make sure that that is what you want to do; that you do not want to testify in this case; is that true?

WATTS:  That's correct.

THE COURT:  Have you talked this over with your lawyer?

WATTS:  Yes.

THE COURT:  Are you satisfied with him as your lawyer?

WATTS:  Yes.

Trial tr. at 482.

At the conclusion of the trial, the judge instructed the jury as follows:

> Before I get into the instructions, I would like to make a comment about Mr. Watts and his obvious sleeping throughout most of the trial.  I don't know how that affected any of you but I'm going to tell you under your oaths as jurors you must not allow that to affect you in any way.  I don't know why Mr. Watts has slept and you don't either and no matter what the reason was, even if we did know, that has nothing to do with whether he's guilty or not guilty of the charge that he's here on trial for today.
>
> So you must not allow that to affect your decision in this case and I'm going to tell you not even to discuss that in any way during your deliberations.

Trial tr. at 529.  Watts could not be awakened to stand as the jury retired to deliberate.

In the interim between conviction and sentencing, Watts was examined by a psychologist.  Watts informed her that he had been using drugs for seven years (since he was sixteen)[2] and that he had been smoking crack cocaine during the trial at night while he was out on bond.  According to the trial judge, the psychologist attributed Watts's inability to stay awake at trial to his staying up nights taking crack "as well as thinking and doing a lot of

_____

[2]Watts had been enrolled in a drug abuse program in 1984.

crying."[3]  Watts explained to the psychologist that he had not

admitted in court to taking drugs because his relatives were

present and he did not want to upset them.

At the sentencing hearing, Watts's counsel and the judge both

said that they had suspected Watts had been taking drugs during the

trial.  (Given that the parties had agreed before trial not to

mention Watts's use of drugs around the time of the murder, Watts's

counsel and the judge obviously were aware that Watts had used

drugs in the past.  They also knew that Watts was out on bond

during the trial.)  Watts himself expressed concern that the jury's

verdict had been influenced by his sleeping:

> WATTS:  The jury made the decision because of my sleeping
> disorder....  They figured I didn't care.
>
> THE COURT:  Maybe you're right.  I told them not to regard
> that and not to consider that in their verdict.
>
> WATTS:  But you can't throw that out of a human mind.
>
> THE COURT:  You are probably right, Mr. Watts.  See how
> rational you are talking now.  You've now got some good
> judgment.  You are thinking rational.  Too bad that all this
> had to happen.

Trial tr. at 584-85.

Watts's conviction and sentence were upheld on direct appeal,

and he is currently incarcerated.  Proceeding pro se, Watts filed

a petition for habeas corpus in federal district court in 1994,

claiming that, because he slept through most of his trial, he was

denied due process as a result of the trial judge's failure to

---

[3]The psychologist determined that Watts did not have brain
damage;  that his intellectual ability was at least average;
that he did not exhibit psychosis, hallucinations, or delusions;
and that he was not suffering from any major mental illness.
Trial tr. at 586-87.

order a competency hearing and as a result of his trial and conviction while incompetent. A magistrate judge agreed. The magistrate issued a report recommending that Watts's petition be granted and appointed a Federal Public Defender to represent him. The district court adopted the magistrate's report and recommendation and vacated Watts's conviction and sentence pending retrial by the State. The State now appeals.

II.

The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. A defendant is incompetent if he lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (internal quotation marks omitted). As the Supreme Court recently has emphasized,

> "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right of effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so."

*Cooper v. Oklahoma,* --- U.S. ----, ----, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996) (quoting *Riggins v. Nevada,* 504 U.S. 127, 139-40, 112 S.Ct. 1810, 1817, 118 L.Ed.2d 479 (1992) (Kennedy, J., concurring)). The competency inquiry, then, is a functional one. It focuses on the criminal defendant's capacity to contribute sufficiently to his own defense to allow a fair trial and, ultimately, serves to protect both the defendant and society

against erroneous convictions.[4]

The issue of Watts's competency to stand trial implicates both the procedural and substantive dimensions of the right. The district court concluded, first, that Watts's procedural due process rights under *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), were infringed by the state trial court's failure to conduct a competency hearing on its own initiative and, second, that Watts's substantive due process rights were violated because he was in fact tried while incompetent. We will address the procedural and substantive claims in turn.[5]

---

[4]The ABA has usefully explained the functional, trial-related nature of the competency inquiry as follows:

> A finding of mental incompetence to stand trial may arise from mental illness, physical illness, or disability; mental retardation or other developmental disability; or other etiology so long as it results in a defendant's inability to consult with defense counsel or to understand the proceedings.
>
> ....
>
> Because the fundamental purpose of the rule [of nontriability of incompetent defendants] is to promote accurate factual determinations of guilt or innocence by enabling counsel to evaluate and present available defenses to factfinders, defendants should have at least the intellectual capacity necessary to consult with a defense attorney about factual occurrences giving rise to criminal charges. Obviously, to accomplish that, defendants require a minimal understanding of the nature of criminal proceedings, the importance of presenting available defenses, and the possible consequences of either conviction or acquittal.

ABA Criminal Justice Mental Health Standards § 7-4.1(c) & commentary (2d ed. 1986).

[5]Both of these claims were exhausted in state court, included in Watts's habeas petition, and decided by the district court.

A. Procedural Due Process

   *Pate* established that a criminal defendant's due process
rights are presumptively violated when a state trial court fails to
conduct, on its own initiative, a competency hearing in the face of
sufficient doubt about the defendant's competency.[6]  This circuit
has derived from *Pate* the objective standard that, in order to
trigger the trial court's obligation to order a competency hearing,
the court must have information raising a "bona fide doubt" as to

---

[6]The due process violation is only "presumptive" because
this circuit has interpreted *Pate* to allow post-deprivation
process to suffice in some circumstances.  If the trial court
fails to order a competency hearing at trial when one is
warranted, the state may still attempt to prove that the
defendant was in fact competent at the time of trial at a *nunc
pro tunc* competency hearing, so long as a reliable inquiry into
the defendant's competency can still be made;  the burden is on
the state. *James v. Singletary,* 957 F.2d 1562, 1570-71 & n. 11
(11th Cir.1992), *cert. denied,* --- U.S. ----, 114 S.Ct. 262, 126
L.Ed.2d 214 (1993);  *Fallada v. Dugger,* 819 F.2d 1564, 1568 (11th
Cir.1987);  *Zapata v. Estelle,* 588 F.2d 1017, 1020 (1979).  If a
reliable ex post evaluation is impossible, the defendant must be
retried, if then competent to stand trial, or else released.
*Fallada,* 819 F.2d at 1568;  *Zapata,* 588 F.2d at 1020.

   The Supreme Court has cautioned, however, that attempts
   to determine competency retrospectively by means of a *nunc
   pro tunc* hearing, even "under the most favorable of
   circumstances," face "inherent difficulties" which may
   render them futile. *Drope v. Missouri,* 420 U.S. 162, 95
   S.Ct. 896, 909, 43 L.Ed.2d 103 (1975);  *see also Pate,* 383
   U.S. at 387, 86 S.Ct. at 843 ("[W]e have previously
   emphasized the difficulty of retrospectively determining an
   accused's competence to stand trial. [citation to *Dusky,* 362
   U.S. at 402, 80 S.Ct. at 789]  The jury would not be able to
   observe the subject of their inquiry, and expert witnesses
   would have to testify solely from information contained in
   the printed record.").

   Given that Watts was tried almost nine years ago, and
   that his condition at the time of trial—influenced both by
   his use of drugs and despair over the murder—would be
   difficult to reconstruct ex post, we agree with the district
   court that "it is unlikely that a meaningful *nunc pro tunc*
   competency hearing ... could be had at this late date."

the defendant's competency.[7]  *See James v. Singletary,* 957 F.2d 1562, 1570 (11th Cir.1992), *cert. denied,* --- U.S. ----, 114 S.Ct. 262, 126 L.Ed.2d 214 (1993);  *Fallada v. Dugger,* 819 F.2d 1564, 1568 (11th Cir.1987).  Relevant information may include evidence of a defendant's irrational behavior, demeanor at trial, or prior medical opinion;  but "[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed."  *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975).

In this case, Watts has failed to establish that there was a bona fide doubt as to his competency during the trial.  It is true that Watts was conspicuously asleep through a large part of the proceedings:  the transcript supports the state appellate court's finding that Watts "slept through about 70% of his murder trial." *Watts v. State,* 537 So.2d 699, 699 (Fla.Dist.Ct.App.1989).  But there is no constitutional prohibition against the trial and conviction of a defendant who fails to pay attention in court—whether out of indifference, fear, confusion, boredom, or sleepiness—unless that defendant also cannot understand the nature of the proceedings against him or adequately assist counsel in conducting a defense.  We have no doubt, furthermore, that both the trial judge and Watts's attorney, who were aware of Watts's history of drug use and his release on bond throughout the trial, suspected

---

[7]The term "bona fide doubt" comes from the Illinois statute considered in *Pate.*  The *Pate* Court did not adopt "bona fide doubt" as a constitutional standard;  it simply found this state standard to be constitutionally adequate.  Nonetheless, the "bona fide doubt" standard has managed to insinuate itself into the opinions of this circuit and is now commonly quoted as the nominal constitutional standard.

that Watts's sleeping was related to contemporaneous drug use. But even had Watts admitted in open court that he could not stay awake at trial because he was up all night smoking crack, this would not necessarily be sufficient to require a *Pate* hearing.

In *Fallada,* this court noted that a defendant's use of drugs (in that case, prescription drugs) does not, per se, necessitate a competency hearing, but is "merely a relevant factor." 819 F.2d at 1569. Recognizing the functional focus of the competency inquiry, the court in *Fallada* stated, "To be entitled to a hearing a defendant must present evidence demonstrating that the dosage given him has affected him sufficiently adversely as to raise a doubt of his ability to consult with his lawyer and to have a rational understanding of the proceedings against him." 819 F.2d at 1569; *see also Pedrero v. Wainwright,* 590 F.2d 1383, 1387-88 (5th Cir.) (information that defendant was a drug addict insufficient to require *Pate* hearing), *cert. denied,* 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979). The fact that a defendant is taking drugs (whether proscribed or prescribed) during trial should alert the court to a potential competency issue, but need not, in itself, necessitate a competency hearing. Other information may convince the court that a formal hearing is not necessary to be reasonably certain that the defendant has the requisite capacity to understand what is going on around him and to communicate with his lawyer.

Here, the only apparent effect of Watts's drug use was his intermittent inability to stay awake at trial. When Watts was awakened, he was able to provide, as the state appeals court found, "lucid and not ... irrational" answers to questions from the bench.

*Watts,* 537 So.2d at 699. Certainly, Watts demonstrated his understanding of the proceedings against him, as he repeatedly expressed anxiety about being on trial for murder.[8] There is no reason to believe that Watts could not have engaged in the same sort of coherent colloquies with his attorney about defense strategy as he did with the trial judge about his sleeping problem.

Because legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect. Accordingly, failure of defense counsel to raise the competency issue at trial, while not dispositive, is evidence that the defendant's competency was not really in doubt and there was no need for a *Pate* hearing. *See Adams v. Wainwright,* 764 F.2d 1356, 1360 (11th Cir.1985), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986). (For the same reason, a defense counsel's request for a *Pate* hearing must be taken seriously by the trial judge.) In this case, Watts's attorney did not raise the issue of Watts's competency or request a *Pate* hearing. Although he did make the comment, "I'm doing my best to represent Mr. Watts under the circumstances he's putting me in," the context of this remark implies that Watts's attorney was primarily concerned that Watts's sleeping would prejudice the jury. At no point during the trial did Watts's attorney suggest that the

---

[8]*See* Trial tr. at 476-77, 484, 556. The dissent points out that Watts "could not have had a factual understanding of the proceedings against him" during the time he was asleep. Without inviting metaphysical debate, we believe it is sufficient that Watts did have such an understanding while he was awake, even if the nature of the proceedings against him was not at all times (sleeping or awake) the focus of his thoughts.

defense was suffering for lack of Watts's assistance.

Competency is contextual.[9]  A criminal defendant represented by counsel generally has limited responsibilities in conducting his defense:[10] primarily, recognizing and relating relevant information to counsel and making the few trial-related decisions reserved for defendants (i.e., whether to plead guilty, whether to request a jury trial, whether to be present at trial, and whether to testify).  The defendant need not participate in the bulk of trial decisions, which he may leave left entirely to counsel (how to select jurors, which witnesses to call, whether and how to conduct cross-examination, what motions to make, and similar tactical

[9]It is also historical.  During the formative period of the competency doctrine in mid-seventeenth century England, virtually all defendants charged with serious crimes represented themselves at trial.  *See Faretta v. California,* 422 U.S. 806, 823, 95 S.Ct. 2525, 2535, 45 L.Ed.2d 562 (1975) ("While a right to counsel developed early in civil cases and in cases of misdemeanor, a prohibition against the assistance of counsel continued for centuries in prosecutions for felony or treason.").  This rule remained in effect in England well into the nineteenth century, though it was apparently abandoned in colonial America.  *See id.* at 824-27, 95 S.Ct. at 2536-37.  During this period it was obviously critical that the defendant be competent, for his defense at trial was entirely in his own hands.  Now that counsel is constitutionally guaranteed in all serious criminal cases, however, the common law basis for expansive competency rights is largely outdated.  *See* Bruce J. Winick, "Incompetency to Stand Trial:  An Assessment of Costs and Benefits, and a Proposal for Reform," 39 Rutgers L.Rev. 243, 260-61 (1987).  Modern analysis of the scope of competency rights must be guided not by Blackstone but by a contemporary understanding of the attorney-client relationship.  *See* Richard J. Bonnie, "The Competence of Criminal Defendants:  Beyond *Dusky* and *Drope*," 47 U.Miami L.Rev. 539, 552-53 (1993);  *see also* Oliver Wendell Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897) ("It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV.").

[10]Of course, the demands placed on the defendant may vary significantly, depending on the complexity of the case, capacity of counsel, and other factors.  The competency inquiry is necessarily fact-specific.

decisions).  In this case, the judge monitored Watts throughout the trial, in particular confirming that Watts understood and stood by his decision not to testify, and verifying that Watts was communicating with his attorney.  *See* Trial tr. at 482.  We might speculate that Watts was unable to be of much use to his attorney in monitoring the testimony of witnesses and providing responsive information that could be useful for cross-examination.  If Watts's attorney had encountered unforeseen or problematic testimony, however, there is no reason to believe that he could not have awakened Watts—requesting a recess if necessary—to explain and discuss the matter.[11]  The record reveals nothing to suggest that Watts was incapable of providing the level of input necessary to mount an adequate defense.[12]

The competency determination, because it looks to the capacity of a particular defendant to play a fact-specific role at trial, requires case-by-case assessment.  *See Drope,* 420 U.S. 162, 180, 95 S.Ct. 896, 908 ("There are, of course, no fixed or immutable signs which invariably indicate the need for further

---

[11]Thus, the dissent's concern that our view would "justify the trial and conviction of a defendant who had been rendered comatose on the eve of trial" is baseless.  Unlike Watts, such a defendant could show that he lacked the capacity to respond to his attorney's structured requests for assistance during the course of the trial.  (Watts replied rationally to the trial judge's questions on each day of his trial).  And of course a comatose defendant, unlike Watts, would lack the capacity to understand the nature of the proceedings against him during trial.

[12]The dissent asserts that Watts "was unable to contribute anything at all to his defense during the majority of his trial." This, however, does not differentiate Watts from most other criminal defendants, who likewise contribute nothing to their own defenses through the vast majority of the proceedings.

inquiry to determine fitness to proceed."). Not surprisingly, then, the numerous opinions addressing defendants' competency from this and other circuits fail to establish a rigid standard of competency that could be applied uniformly across cases. Nor do cases presenting superficially similar facts necessarily dictate the same conclusions as to competency.

For example, in *Whitehead v. Wainwright,* 609 F.2d 223 (5th Cir.1980), the court affirmed the district court's conclusion that the habeas petitioner, Whitehead, had been incompetent to stand trial. Whitehead had been agitated and nervous during the first day and the morning of the second day of his two-day murder trial, attempting to discharge his attorney several times and to take part in the cross-examination of witnesses. He was then given an antihistamine and two prescription tranquilizers (two doses of each within two hours). As a result, during the afternoon of the second day of trial Whitehead "seemed drunk, sleepy, staggering, and glassy-eyed." He fell asleep in court, his speech was slurred, and later he could not remember making statements attributed to him in the transcript. *See Whitehead v. Wainwright,* 447 F.Supp. 898, 899–901 (M.D.Fla.1978) (reciting facts).

In this case, Watts displayed none of Whitehead's pre-medication aberrant behavior. Moreover, whereas Watts could be awakened into drug-free lucidity—as confirmed by the trial judge on each day of the trial—Whitehead was under the chemical influence of drugs during most of the second day of his trial, apparently rendering him unable to comprehend the proceedings or communicate with his attorney even when he was awake. Watts's situation is

simply too dissimilar to Whitehead's for a meaningful analogy to be drawn.[13]  More than this, the comparison of the two cases only serves to illustrate the need for the competency inquiry to be functional and case-specific, not formalistic and rule-driven.

In sum, we are convinced that the trial judge afforded all the process due to make reasonably sure that Watts was competent to stand trial.  Clinical evaluation of Watts in a formal *Pate* hearing simply was not necessary for the trial judge to make the functional determination that Watts was competent.

This is not to say that the trial judge's determination was necessarily the correct one, however.  Whether Watts was, in fact, competent is a separate question, to which we now turn.

B. Substantive Due Process

Even though Watts was not entitled to a *Pate* hearing based on the information available at trial, he has an independent due process right not to be tried and convicted while incompetent.  *See Pate,* 383 U.S. at 377, 86 S.Ct. at 838.  In asserting this right, the defendant bears the burden of proving by a preponderance of the evidence that he was incompetent at the time of trial.  *James,* 957 F.2d at 1571.  We have warned that " "[c]ourts in habeas corpus

---

[13]Irrespective of the distinguishing facts of *Whitehead,* the inconsistency among competency cases makes analogizing to a single case somewhat arbitrary.  *Compare Whitehead with United States v. Rinchack,* 820 F.2d 1557, 1564 n. 8, 1568-70 (11th Cir.1987) (no due process problem with trying defendant who suffers from brain damage causing dizziness, seizures, disorientation, inability to think clearly, and amnesia) *and Thomas v. Kemp,* 796 F.2d 1322, 1325-26 (11th Cir.1986) (*Pate* hearing not required for defendant who had kept witness locked in closet for a week and jumped on corpse of nine-year-old victim in her presence, exhibited inability to communicate with his attorney before trial, and sat throughout trial with his fist raised in some sort of salute).

proceedings should not consider claims of mental incompetence to stand trial where the facts are not sufficient to positively, unequivocally, and clearly generate a real, substantial, and legitimate doubt as to the mental capacity of the petitioner.' " *See Sheley v. Singletary,* 955 F.2d 1434, 1438 (11th Cir.1992) (quoting *Bruce v. Estelle,* 483 F.2d 1031, 1043 (5th Cir.1973)). This caution resonates with the difficulty of making competency determinations ex post, as well as with our reliance on the more readily policed procedural dimension of the due process right.

In this case, the only difference between the merits of the procedural and substantive claims is with respect to the relevant factual bases: in determining whether Watts was actually incompetent, we are not limited to the information available to the state trial court before and during trial, as we are in evaluating the procedural claim. *See James,* 957 F.2d at 1572. For Watts, however, this is not a difference that makes a difference. As discussed previously, even given the fact, revealed at sentencing, that Watts slept through much of his trial as a result of smoking crack at night, the record—devoid of substantial evidence that Watts could not adequately understand the proceedings or assist counsel in his defense—does not unequivocally generate a substantial doubt about his competency to stand trial.

The district court's grant of the writ of habeas corpus is thus REVERSED.

CARNES, Circuit Judge, dissenting:

The issue in this case is whether the Constitution permits the trial and conviction of a defendant whose condition is such that he

is not aware of what is going on during seventy percent of his five-day trial.  The majority thinks so.  I think not.

I.

Before discussing my disagreement with the majority about the issues that are presented in this appeal, it might be helpful to discuss why we all agree that one issue is not presented.  An explanation is in order because that issue seems so clearly raised by the facts of this case.  It is, but the State of Florida chose not to argue the issue to us.  The issue I am speaking of involves the self-induced nature of Carl Watts' condition during his trial.

Watts did not know what was going on during most of his murder trial and, according to his trial counsel, was not able to assist counsel during that time, because Watts stayed up all night every night of the trial obtaining and smoking crack cocaine.  At the time, Watts was a twenty-three year old crack addict, having been hooked on cocaine for seven years.  He had shot his best friend to death with a shotgun—after having prepared a sandwich for him a few hours earlier—as a result of an argument over ten dollars worth of a twenty dollar bill.  Watts admitted the shooting but claimed self defense.  He was out on bond during the trial, and he was scared, depressed and anxious about what he had done, and about his prospects.  So, Watts did what crack addicts do:  he spent all the time he could scrounging around for and smoking crack.

And Watts lied about it.  Crack addicts do that a lot, too.  Astonished by Watts' bizarre behavior of sleeping though the trial, the judge periodically asked him point blank if he had been taking drugs, and Watts point blank told him no.  The judge suspected

Watts was lying, but let it go.  He did not order Watts examined, and he did not revoke his bond, which would have (hopefully) cut off his access to crack.

Nonetheless, no one held a gun to Watts' head and forced him to run around smoking crack each night of the trial.  And no one forced him to lie repeatedly to the judge about his condition.  Thus the facts frame the issue of whether self-induced incompetency is to be treated differently or, to put it another way, whether one whose own deliberate actions throughout the trial caused his incompetency has waived his right not to be tried while incompetent.  Arguments can be made both ways, and it is an interesting issue.  But it is not one that has been presented to us.

On direct appeal, the State of Florida argued that because Watts had intentionally induced his condition at trial, he was barred from complaining about being tried while in that condition.  The Florida appellate court rejected that contention, holding that the Florida Supreme Court had previously foreclosed it.  *Watts v. State,* 537 So.2d 699, 700 (Fla. 4th DCA 1989) (citing *Lane v. State,* 388 So.2d 1022, 1026 (Fla.1980) ("Intentional action by a defendant does not avoid or eliminate the necessity of applying the test of whether a defendant has the sufficient present ability to assist counsel with his defense and to understand the proceedings against him.")).

The Florida appellate court ruled in the State's favor in this case anyway, affirming Watts' conviction.  The federal district court did not, however, and the State could have chosen to argue

the self-inducement, or waiver, position to us. After all, we are no more bound by the Florida courts' holdings on such an issue than those courts would be bound by an earlier holding of this Court on some federal constitutional issue. Nonetheless, the State chose not to argue self-inducement or waiver to this Court. It is not mentioned in the State's initial brief or in its reply brief, and the attorney representing the State tenaciously resisted our efforts to explore the issue at oral argument. For that reason, the majority does not address the issue, and I cannot say that the majority is wrong for failing to do so. *See, e.g., Hartsfield v. Lemacks,* 50 F.3d 950, 953 (11th Cir.1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned." (quotation marks and citation omitted)); *Marek v. Singletary,* 62 F.3d 1295, 1298 n. 2 (11th Cir.1995) ("Issues not clearly raised in the briefs are considered abandoned."), *petition for cert. filed,* (U.S. March 22, 1996) (No. 95-9105); 16 Wright, *et al.,* Federal Practice and Procedure § 3974, at 421 n. 1 (1977) ("An issue not raised or argued in the brief of the appellant may be considered waived and thus will not be noticed or entertained by the court of appeals."). Whether a defendant who induces his own incompetency can successfully assert it as a bar to trial is an issue for another day. I turn now to the issue that is presented to us, the issue for this day.

## II.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with

counsel, and to assist in preparing his defense may not be subjected to trial." *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). A defendant is not mentally competent to stand trial unless he has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (quotation marks omitted). The majority does not quarrel with the statement of these fundamental precepts, and it acknowledges that Watts was asleep during seventy percent of his trial. Nonetheless, the majority concludes that it was constitutionally permissible to try him in that condition.

In reaching its holding that Watts, although asleep during most of his murder trial, was nevertheless mentally competent to be tried, the majority discounts the constitutional importance of a defendant's ability to understand the proceedings against him, and to aid in his defense. It minimizes a defendant's role in his murder defense by characterizing it as one of "limited responsibilities," involving "few trial-related decisions reserved for defendants (*i.e.,* whether to plead guilty, whether to request a jury trial, whether to be present at trial, and whether to testify)." *See* Majority op. at 2675-76. The majority then reasons that, because "[t]he defendant need not participate in the bulk of trial decisions, which may be left entirely to counsel," a defendant capable of making those few strategic decisions that only a defendant can make is capable of "providing the level of input necessary to mount an adequate defense," and therefore is competent to stand trial. *See* Majority op. at 2676. Under the majority's

view, once a defendant has made those few strategy decisions, his presence at trial, or at least his awareness of what is happening during trial, is of no constitutional significance. I disagree.

The requirement that a defendant be mentally competent to stand trial is a long-held tenet of common law. *See, e.g., Medina v. California,* 505 U.S. 437, 444, 112 S.Ct. 2572, 2577, 120 L.Ed.2d 353 (1992) ("The rule that a criminal defendant who is incompetent should not be required to stand trial has deep roots in our common-law heritage."); *Drope,* 420 U.S. at 171, 95 S.Ct. at 903; *Youtsey v. United States,* 97 F. 937, 940 (6th Cir.1899) (recognizing mental competency requirement and that, "[t]o the same effect are all the common-law authorities"). "The competency rule did not evolve from philosophical notions of punishability, but rather had deep roots in the common law as a by-product of the ban against trials in absentia; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself." *Stone v. United States,* 358 F.2d 503, 507 n. 5 (9th Cir.1966) (quotation marks and citation omitted). The rule against trying the mentally incompetent does embrace concerns that a defendant be able to make major decisions that may determine his fate. As Blackstone wrote, one who becomes "mad" after the commission of an offense should not be arraigned for it "because he is not able to plead to it with that advice and caution that he ought." 4 William Blackstone, Commentaries *24. But the rule extends beyond pleading concerns. Blackstone also wrote that if a defendant becomes mad after pleading, he should not be tried, "for how can he make his defence?" *Id.; see also* 1 M.

Hale, Pleas of the Crown *34-*35 (same).  The prohibition against trying a defendant whose condition renders him unable to participate in his defense is an important safeguard "fundamental to an adversary system of justice," and incorporated into the Due Process Clause.  *Drope,* 420 U.S. at 172, 95 S.Ct. at 904; *see also Cooper v. Oklahoma,* --- U.S. ----, ----, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996) ("We have repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." (quotation marks and citation omitted));  *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966) ("[T]he conviction of an accused person while he is legally incompetent violates due process....").

Faced with the long and distinguished pedigree of the right not to be tried while incompetent, the majority struggles to diminish the importance of that right, and its struggle produces a remarkable conclusion.  Citing a law review article, whose title suggests a cost-benefit analysis, the majority engages in a "[m]odern analysis" using "contemporary understanding" and reaches the conclusion that "the common law basis for expansive competency rights is largely outdated."  Majority op. at 2676 n. 9.  The competency rights recognized in courts of Blackstone's day are too liberal for us, it seems.  *But see Cooper,* --- U.S. at ----, 116 S.Ct. at 1376 ("No one questions the existence of the fundamental right that petitioner invokes....  Nor is the significance of this right open to question.")[1]

---

[1]The majority opinion quotes Holmes for the proposition that, "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV."  Majority

We sometimes speak of "the evolving standards of decency that mark the progress of a maturing society," but I always thought it understood that the evolution was supposed to be forward. This is the first time I have heard it suggested that our standards have progressed in such a way that contemporary understanding in the last decade of the twentieth century would deny an American citizen the full benefit of an important trial right guaranteed Englishmen at least as early as the middle of the seventeenth century. Some understanding. Some progress.

The majority's opinion today reduces the important safeguard against being tried while incompetent to one that merely requires that a defendant be able to make a few strategic decisions, and it is apparently enough for the majority if those decisions are made before the trial even begins. *But see Cooper,* --- U.S. at ---- - ----, 116 S.Ct. at 1381-82 ("After making the profound choice whether to plead guilty, the defendant who proceeds to trial ... also is called upon to make myriad smaller decisions concerning the course of his defense. The importance of these rights and decisions demonstrates that an erroneous determination of

op. at 12 n. 9 (quoting Oliver Wendell Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897)). That is a nice quote. But Holmes, as he said, had in mind such things as "the technical rule as to trespass *ab initio,* as it is called which I attempted to explain in a recent Massachusetts case." Holmes, *supra,* at 469 (footnote containing citation omitted). He was not thinking of or speaking about any of an accused's criminal trial rights, and certainly not about a criminal trial right so "fundamental to an adversary system of justice," *Drope,* 420 U.S. at 172, 95 S.Ct. at 904, as to be incorporated into the Due Process Clause, *Cooper,* --- U.S. at ----, 116 S.Ct. at 1376. Nor did Holmes disparage the use of history as part of the process of determining the law. Indeed, in the same article he said, "The rational study of law is still to a large extent the study of history." Holmes, *supra,* at 469.

competence threatens a fundamental component of our criminal justice system—the basic fairness of the trial itself." (quotation marks and citations omitted)).  Apparently, under the majority's view, the necessary decisions can be made at any time, and once they are made, any claim of incompetency is foreclosed.  Thus the majority's position quickly reduces to the absurd.  It would, for example, justify the trial and conviction of a defendant who had been rendered comatose on the eve of trial, provided only that he had communicated his views on the necessary strategic decisions to his counsel beforehand.

The majority does not justify its cribbed reading of the competency requirement, a reading which affords no protection to a defendant such as Watts who was unable to contribute anything at all to his defense during the majority of the trial.  The Supreme Court has instructed us that "it is not enough ... that the defendant [is] oriented to time and place and [has] some recollection of events."  *Dusky,* 362 U.S. at 402, 80 S.Ct. at 788-89 (alteration in original) (quotation marks omitted).  Instead, the critical inquiry is into "whether he has sufficient *present* ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."  *Id.* (alteration in original) (emphasis added) (quotation marks omitted).  Watts was neither oriented in time and place, nor able to consult with his lawyer during seventy percent of his five-day murder trial.  He could not have had a factual understanding of the proceedings against him during that time, because he was not

cognizant of those proceedings or of anything else, save perhaps for what he may have been dreaming. Because of his condition, Watts was unable to contribute sufficiently to his defense.

Contrary to what one might infer from reading the majority opinion, Watts' attorney could not communicate with him whenever he thought it necessary, and the judge did not verify that counsel could. Although the record shows that counsel could sometimes awaken Watts, it also shows that on more than one occasion during the trial, counsel was unable to wake him up, and the court noted that fact for the record. At one point, defense counsel said to Watts: "[Y]ou didn't even notice that I attempted to wake you up," and the judge observed, "On one occasion I saw you hit him in the shoulder and he never even moved. He never budged." (Trial Tr. at 337-38). As the majority concedes, "Watts could not be awakened to stand as the jury retired to deliberate." Majority op. at 2671.

Nor is it accurate to infer, as one might from the majority opinion, that when counsel stated in exasperation, "I'm doing the best I can to represent Mr. Watts under the circumstances he's putting me in," Majority op. at 2671, that counsel was simply, or primarily, concerned that the jury might be prejudiced by seeing Watts sleep through his trial. At sentencing, which occurred just eight days after the trial, defense counsel made the following representation to the judge:

> I went through a trial where my client was literally unable to help me, whatever. I was unable to even talk to him because I couldn't wake him up. That was the reason why.

(Trial Tr. at 567-68). The trial judge did not express any doubt about the accuracy of counsel's statement, nor did the state

appellate court. After considering the record as a whole, and crediting defense counsel's statement, the district court concluded that "there were lengthy periods during critical stages of his murder trial that [Watts] was unable to assist his attorney." (Report of Magistrate Judge at 19).[2] That is a factfinding of the district court, and it is certainly not clearly erroneous.

The prosecution presented thirteen witnesses against Watts, many of whom described the scene where the killing occurred, or his actions near the time of it. However, there were no eyewitnesses to the actual killing, other than Watts, who did not testify. The evidence presented a close issue about self defense—the man Watts shot was much larger than he, had a violent nature, and was advancing on him inside Watts' own apartment when the shooting occurred. Because of the closeness of that issue, and the nature of the testimony, Watts' ability to assist his counsel with the facts as the testimony unfolded was critical. Yet Watts was unable to assist his lawyer in formulating cross-examination, because he did not hear most of the testimony.

Watts may have been able to contribute generally to his lawyer's cross-examination strategy hours or days *in advance* of it. In the same way, he was able to make certain strategic decisions in advance—such as his decision not to testify, which he communicated to his lawyer more than a week before the trial began. However, Watts was not *presently* able to assist his lawyer during the majority of his trial. Nor was he able to reconsider any of his

---

[2]The magistrate judge's report and recommendation was adopted and approved in its entirety by the district court.

strategic decisions, such as his decision not to take the stand, in light of the testimony against him; he was not able to do that, because he did not hear most of the testimony against him.

The majority's holding in this case is contrary to this Court's decision in *Whitehead v. Wainwright,* 609 F.2d 223 (5th Cir.1980). In that case, Whitehead, the defendant, had taken Benadryl for his allergies, and also the tranquilizers Valium and "Roche 66." With the court's permission, those tranquilizers had been prescribed by a doctor who examined Whitehead and treated him for a nervous condition during the trial. As a result of taking that medication, Whitehead became extremely drowsy during one afternoon of his two-day trial. *Whitehead v. Wainwright,* 447 F.Supp. 898, 900-01 (M.D.Fla.1978). Whitehead's lawyer later testified he could not recall the nature or extent of his communication with his client during the afternoon of the second day of trial, but he thought it had been as much as was necessary. He did remember that Whitehead had his head on the table in front of him at times during the afternoon, and that, toward the end of the trial, he had rested his head in his arms much of the time. *Id.* at 901. Two family members testified that Whitehead had "seemed drunk, sleepy, staggering, and glassy-eyed." His lawyer would "punch" him to awaken him. *Id.* Whitehead himself later testified that he had fallen asleep at the defense table. *Id.*

As a result of that testimony, the district court in *Whitehead* held that the defendant, because he had been groggy or asleep during one-fourth of his trial, had been unable to consult sufficiently with his lawyer, had lacked a sufficient rational or

factual understanding of the proceedings against him, and therefore had been incompetent to stand trial. The district court granted habeas relief. *Id.* at 902-03. On appeal, we affirmed the district court's holding that the defendant had been incompetent on the afternoon of the second day of his trial, and affirmed its grant of relief. We concluded by saying:

> While we are convinced that the state trial judge did all he could to assure petitioner a fair trial, short of dismissing the jury and starting anew at a later date, the district court's finding of incompetence is supported by the record and must be left undisturbed.

*Whitehead,* 609 F.2d at 224.

The majority attempts to deal with the binding precedent of the *Whitehead* decision in two ways, neither of which is convincing. First, the majority suggests that Whitehead, the defendant in that case, had been in materially worse shape than Watts was in this case, because, the majority says, Whitehead was "unable to comprehend the proceedings or communicate with his attorney even when he was awake." Majority op. at 2677. That would be news to Whitehead's attorney and to the courts that decided the case. Whitehead's lawyer testified that, in his opinion, Whitehead had been aware of what was happening in the courtroom, and that he thought he had been able to communicate with Whitehead as much as was necessary during the afternoon in which his condition was in question. 447 F.Supp. at 901. Nonetheless, the district court held that Whitehead had been incompetent to stand trial, and we affirmed.

The second way the majority attempts to deal with the binding precedent of the *Whitehead* decision is by suggesting that there can

be no binding precedent in this area of the law. That is so, the majority implies, because "the inconsistency among competency cases makes analogizing to a single case somewhat arbitrary." Majority op. at 2677 n. 13. This proposition, if true, bodes ill for the rule of law. Surely our circuit law is not so confused and inconsistent that decision by analogy, *i.e.,* by rule of law, has been reduced to a "somewhat arbitrary" process that justifies throwing up our hands and simply picking a result that seems to comport with our feelings at the time. If the majority were right that our precedents are so inconsistent that following them was, at best, "somewhat arbitrary," then the situation cries out for en banc review, and this case can be a vehicle for it.

Even if our decisions in this area of the law are as inconsistent as the majority believes, however, there is no inconsistency as it relates to the specific issue in this case. At least not until today. Before today, neither this Court, nor any other court that I am aware of, had ever held that a defendant who is not aware of what is going on during most of his trial is competent to stand trial. Our holding in *Whitehead* was that a defendant who is groggy, sleepy, and asleep during one afternoon of his two-day trial is incompetent to stand trial. That holding cannot be reconciled with the majority's holding in this case that someone who is asleep during most of his trial is not incompetent. A defendant who is not consciously aware of what is happening during seventy percent of his trial, whether because he is in a drug-induced stupor or simply asleep, cannot rationally and factually understand the proceedings during that time, nor can he

react to any testimony or other evidence and communicate with his lawyer about it.

In *Ferrell v. Estelle,* 568 F.2d 1128 (5th Cir.), *withdrawn,* 573 F.2d 867 (5th Cir.1978),[3] we affirmed the district court's grant of habeas relief to a petitioner who became deaf between the time of the murder with which he was charged and the time of his trial. In the brief period from the onset of his deafness to his trial, Ferrell did not learn to read lips or to understand sign language. His counsel asked the court to provide stenographers who could contemporaneously transcribe the words spoken during the trial. The judge denied the request. We affirmed the grant of habeas relief. Although Ferrell was able to communicate with his lawyer from time to time (by exchanging notes), and was therefore able to make important strategic decisions regarding his defense, he was not able to understand contemporaneously the testimony against him.[4] In this case, Watts' inability "to consult with his lawyer with a reasonable degree of rational understanding," and obvious lack of "a rational as well as factual understanding of the

---

[3]Our decision in *Ferrell* was withdrawn upon discovery that the petitioner had died three months before the decision was released. Because it was withdrawn, the *Ferrell* decision is not binding precedent, but I discuss it here because the reasoning is persuasive and the facts pose such a thought-provoking hypothetical.

[4]The Court in *Ferrell* did not reach the issue of whether Ferrell's incompetency deprived him of substantive, as distinguished from procedural, due process. The Court conceived of other alternatives, besides stenographers (who would have slowed down the trial), that would have given Ferrell the ability to contemporaneously understand the proceedings. The Court concluded that "Ferrell's rights were reduced below the constitutional minimum," because the district court failed to explore such other possibilities. *Id.* at 1133.

proceedings," *Dusky,* 362 U.S. at 402, 80 S.Ct. at 789, was at least as profound as Ferrell's.

Although supported by the binding precedent of the *Whitehead* decision and by the withdrawn opinion in *Ferrell,* my position is not dependent upon either of them. Instead, it rests on its own simple logic: A defendant who is contemporaneously unaware of what is going on during most of his trial does not have a rational as well as factual understanding of what is occurring, as it is occurring, and lacks the present ability to consult with his attorney during the trial and in response to its events. Therefore, the trial and conviction of a defendant who suffers from such a condition is unconstitutional. I would affirm the district court decision granting Watts relief for the violation of his substantive due process right not to be tried while mentally incompetent.

                              III.

Because I conclude that Watts was tried while incompetent, which violates his substantive due process rights, it is unnecessary for me to decide whether a violation of his procedural due process rights also occurred because the trial judge did not conduct a hearing into Watts' competency to stand trial.

However, I do note that the judge knew that Watts was a drug addict, knew he was out on bond, knew he was behaving strangely during trial, was told by defense counsel at the time that he was "pretty sure" Watts was using drugs (Trial Tr. at 564, 566), and the judge did not believe Watts' denials. As the judge stated on the record at sentencing, "everybody that was a witness to Carl's

conduct had some suspicions that he was probably taking some kind of drugs."  (Trial Tr. at 567).  Suffice it to say, in view of all of the circumstances, it seems to me that the judge not only should have had, but actually did have "a bona fide doubt" as to Watts' competency to stand trial.

IV.

I dissent from the Court's reversal of the district court's grant of habeas relief.  We should affirm.